IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


GREEN PARTY OF PENNSYLVANIA,       :            CIVIL ACTION
et al.                             :
                                   :
          v.                       :
                                   :
CAROL AICHELE, Secretary of the    :            NO. 14-3299
Commonwealth of Pennsylvania, et al. :

MEMORANDUM

Dalzell, J.                                            March 2, 2015

Plaintiffs are aspiring[1] political parties and their supporters who challenge the

constitutionality of certain provisions of the Pennsylvania Election Code (or "Election Code")

and the defendants' interpretation of it.  Before us are plaintiffs' amended motion for partial

summary judgment and defendants' motion for summary judgment.

For the reasons detailed at length herein, we will grant plaintiffs' motion in part and deny

it in part and grant the defendants' motion in part and deny it in part.


I.        **Procedural History**

On June 9, 2014 the Green Party of Pennsylvania, the Libertarian Party of Pennsylvania,

and six individual plaintiffs affiliated with those political entities (collectively, the "Green Party

plaintiffs") filed suit to challenge the Commonwealth's enforcement of three provisions of the

Pennsylvania Election Code.  On June 24, 2014 the case was reassigned to us from the docket of

Judge Thomas N. O'Neill, Jr.[2]  On July 14, 2014, the Green Party plaintiffs filed a 182-page

---

[1] We take this word from our Court of Appeals's recent decision in The Constitution Party of
Pennsylvania, et al. v. Aichele, et al., 757 F.3d 347, 350 (3d Cir. 2014).
[2] On the same day the Pennsylvania Attorney General's Office entered its appearance on behalf
of the Commonwealth of Pennsylvania (docket no. 5), thereby satisfying Fed. R. Civ. P. 5.1.

amended complaint listing twenty-nine counts for relief alleging that the statutory provisions of the Election Code at issue are facially unconstitutional, unconstitutional as-applied, and violate the National Voter Registration Act, the Elections and Supremacy Clauses of the U.S. Constitution, and certain Pennsylvania election laws.

The plaintiffs seek declaratory, injunctive and mandamus relief from the Commonwealth's requirements governing nomination papers that must be submitted under its rules for minor parties (such as the Libertarian Party of Pennsylvania) and political bodies (including the Green Party of Pennsylvania) who seek to appear on the general election ballot. Amended Complaint ("AC") at 2. Under the Election Code, the two major political parties vie in primaries to have candidates' names published on general election ballots, but minor parties and political bodies must gather signatures on nomination paper forms in an often-painstaking process, and their candidates must file those nomination papers in order to appear on the general election ballot. See Constitution Party of Pennsylvania, et al. v. Carol Aichele, et al., 757 F.3d 347, 351 (3d Cir. 2014). Major party candidates file "nomination petitions" to appear on the primary ballot, which are subject to different statutory requirements under the Election Code.

The Commonwealth's requirements regarding nomination papers are set forth in 25 Pa. Stat. Ann. § 2911 (West 2014). On July 29, 2014, three days before the August 1, 2014 nomination paper filing deadline, the Green Party plaintiffs filed an emergency motion for a temporary restraining order and preliminary injunction that sought to enjoin the defendants from enforcing their interpretation of 25 Pa. Stat. Ann. §§ 2911 (a), (c) and (d) (West 2014).

The relevant portions of Section 2911 provide that:

> (a). . .[N]omination of candidates for any public office may also be
> made by nomination papers signed by qualified electors[3] of the

---

[3] The Election Code does not define "elector." However, a "qualified elector" is "any person

State, or of the electoral district for which the nomination is made, and filed in the manner herein provided. . . .

(c) Each person signing a nomination paper shall declare therein that he is a qualified elector of the State or district, as the case may be, and shall add to his signature his legibly printed name and residence, giving city, borough or township, with street and number, if any, and shall also add the date of signing, expressed in words or numbers: Provided, however, That if said political district named in the papers lies wholly within any city, borough or township, or is coextensive with same, it shall not be necessary for any signer of a paper to state therein the city, borough or township of his residence. No elector shall sign more than one nomination paper for each office to be filled, unless there are two or more persons to be elected to the same office, in which case he may sign nomination papers for as many candidates for such office as, and no more than, he could vote for at the succeeding election. More than one candidate may be nominated by one nomination paper and candidates for more than one office may be nominated by one nomination paper: Provided, That each political body nominating does not nominate more candidates than there are offices to be voted for at the ensuing election: And provided, That all the signers on each nomination paper are qualified to vote for all the candidates nominated therein.

(d) Nomination papers may be on one or more sheets and different sheets must be used for signers resident in different counties. If more than one sheet is used, they shall be bound together when offered for filing if they are intended to constitute one nomination paper, and each sheet shall be numbered consecutively, beginning with number one (1) at the foot of each page. Each sheet shall have appended thereto the affidavit of some person, not necessarily a signer, and not necessarily the same person on each sheet, setting forth--(1) that the affiant is a qualified elector of the State, or of the electoral district, as the case may be, referred to in the nomination paper; (2) his residence, giving city, borough or township with street and number, if any; (3) that the signers signed with full knowledge of the contents of the nomination paper; (4) that their respective residences are correctly stated therein; (5) that they all reside in the county named in the affidavit; (6) that each signed on

---

who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election." 25 Pa. Stat. Ann. § 2602(t) (West 2014).

the date set opposite his name; and (7) that, to the best of affiant's knowledge and belief, the signers are qualified electors of the State, or of the electoral district, as the case may be.

25 Pa. Stat. Ann. §§ 2911 (a), (c) and (d) (West 2014) (contested provisions underlined).

Specifically, the plaintiffs sought to enjoin the defendants from enforcing (1) their interpretation that Subsection (a) requires that a "qualified elector" be a registered voter before signing nomination papers; (2) Subsection (c)'s requirement that signers of nomination papers record the year of signing; (3) Subsection (d)'s in-state residency requirement for witnesses executing an "Affidavit of Qualified Elector" -- that plaintiffs refer to as the "In-State Witness Requirement" -- (4) the requirement on the nomination paper form that it be executed "in the presence of a person empowered to take acknowledgments (such as a notary public"); and (5) Subsection (d)'s requirement that different sheets be used by signers resident in different counties.  Emer. Mot. at 1, 2.

On July 31, 2014, we held a hearing on the emergency motion.  Based on the parties' stipulations and the testimony in court that day, we from the bench granted in part and denied in part the plaintiffs' motion for an emergency temporary restraining order.  We enjoined the defendants from enforcing the In-State Witness requirement of 25 Pa. Stat. Ann. §2911(d) (West 2014).  But we denied the Green Party plaintiffs' motion as to the Subsection (d) nomination paper's requirement that the Affidavit should be executed in the presence of a person empowered to take acknowledgments, such as a notary, and that different sheets be used by signers who reside in different counties.  We also denied plaintiffs' motion as to defendants' interpretation of Subsection (a)'s requirement that qualified electors signing nomination papers be registered to vote on or before the day they sign the nomination papers.  Finally, as the Commonwealth's Commissioner of Elections represented to us that the Commonwealth no longer enforces the Subsection (c) requirement that each person signing a nomination paper record the year of

4

signature, we denied that aspect of the emergency motion as moot and memorialized our decision in our July 31, 2014 Order (docket no. 16).

On August 4, 2014 we convened a Rule 16 conference in Chambers and set a schedule for dispositive motions.  On October 31, 2014, the defendants filed a motion for summary judgment and the same day the Green Party plaintiffs filed a motion for partial summary judgment, which they sought by motion to amend on November 19, 2014.  We consider both sides' motions now.

## II.    Legal Standard

Summary judgment is warranted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party moving for summary judgment bears the burden of proving no genuine issue of material fact exists.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).   To that end, the movant must inform the district court of the basis for its argument by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).    Where the movant is the defendant or the party that does not have the burden of proof on the underlying claim, it "has no obligation to produce evidence negating its opponent's case," National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992).  The movant need only point to the lack of evidence supporting the non-movant's claim.  Id.

The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006).   A factual dispute is

"genuine" if it turns on "evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." Id. at 248. That is, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude" summary judgment. Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Anderson, 477 U.S. at 248).

When both parties move for summary judgment, our task is no different. As our Court of Appeals has cautioned,

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

Rains v. Cascade Industries, Inc., 402 F.2d 241, 245 (3d Cir. 1968). Cross-motions should not be interpreted necessarily to mean that judgment should be entered on either one of them. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. 10A Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure, § 2720 (3d ed. 2014). As in any summary judgment motion, the determination whether a genuine issue concerning a material fact exists is itself a question of law that the Court must decide. A party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for purposes of his own motion. Id. As Wright and Miller observe, "It follows that the legal theories the movant advances in support of a Rule 56 motion and the assertion that there is no issue of material fact may not be used against the movant when the court rules on his

adversary's motion." <u>Id.</u>

It is well-established that Rule 56 obliges the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Celotex</u>, 477 U.S. at 324; <u>see also</u> Fed. R. Civ. P. 56(c). If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law. <u>See Celotex</u>, 477 U.S. at 322. Specifically, Fed. R. Civ. P. 56(e) provides in relevant part that "[i]f a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."

Because we consider cross-motions before us, "[t]he fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied his burden and should be granted summary judgment on the other motion." 10A Wright & Miller at §2720.

Both motions must be denied if we find there is a genuine issue of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court may render judgment. <u>Id.</u>

## III. The Parties' Stipulated Facts

Carol Aichele, the Secretary of the Commonwealth of Pennsylvania (or "Secretary"), is the chief state election official who, with her staff, is ultimately responsible for the administration of elections in accordance with the Election Code. Parties Stipulated Facts ("SF")

7

¶ 1.[4]  Jonathan Marks is the Commissioner for the Bureau of Commissions, Elections and Legislation for the Department of State ("DOS") with day-to-day responsibilities for overseeing the electoral process in the Commonwealth of Pennsylvania.  Id. at ¶ 2.

The minimum number of signatures necessary to appear on the ballot is set by a formula in 25 Pa. Stat. Ann. § 2911(b)  that the plaintiffs do not contest.  Id. at ¶ 9.  Each year, signatures may be gathered as of the tenth Wednesday before the date of the primary election -- in 2014, that day was March 12, 2014.  Id. at ¶ 10.  Nomination papers must be filed with the Secretary by August 1 of each year.  Id. at ¶ 11.  The Secretary may reject a nomination paper if

> (a) it contains material errors or defects apparent on the face thereof, or on the face of the appended or accompanying affidavits; or (b) it contains material alterations made after signing without the consent of the signers; or (c) it does not contain a sufficient number of signatures as required by law. . . .

Id. at ¶ 12 (citing 25 Pa. Stat. Ann. § 2936).  That provision allows, but does not require, the Secretary to review signatures and reject any she deems not genuine though Commissioner Marks testified that the Commonwealth does not review signatures for genuineness.  Id. at  ¶¶ 13, 14.

At his deposition, Commissioner Marks testified that the DOS was revising the way it generates and distributes nomination papers.  Id. at ¶ 28.  As part of that effort, the DOS will require the candidate to enter the election year into the form, which will result in the year being printed on the nomination paper form -- in partial conformity to Section 2911(c).  Id. at  ¶¶ 25, 28.  He also testified that the DOS will generate an alternative form in non-presidential election years, one without a presidential elector box, which will allow more signature lines on each sheet.  Id. at ¶ 32.  Commissioner Marks also testified that forms for future elections will no

---

[4] The parties filed these Stipulated Facts at docket no. 24 on October 17, 2014.

longer carry the following "Note":

> While the Secretary of the Commonwealth will not reject nomination papers on the basis that the circulator does not reside in the district specified in the nomination paper, the candidate(s) should be aware that the nomination papers may be challenged in Commonwealth Court on the basis that the circulator does not reside in the district.

Id. at ¶¶ 33, 34.

Sections 2911(a) and (c) state that only "qualified electors" of the State or electoral district may sign nomination papers, which the Secretary interprets to include only those individuals registered to vote at the time they sign the nomination papers.  Id. at ¶¶ 35, 36.  This requirement appears on the form's instructions to the person soliciting signatures, known as the "circulator".  Id. at ¶ 36.  Section 2911 does not explicitly state whether "qualified electors" for purposes of subsections (a) and (c) include those eligible to vote who have not yet registered to do so.  Id. at ¶ 37.

Private parties may challenge nomination petitions and papers, which are presumed by statute to be valid if timely filed with and accepted by the Secretary.  Id. at ¶¶ 38, 39; see also Section 2937.  The objectors bear the burden of showing that a signature on a nomination paper is not genuine.  Id. at ¶ 40.  The Commonwealth Court hearing such an objection requires objectors to compare the information on the nomination paper with the information recorded in the Statewide Uniform Registry of Electors ("SURE") system.[5]  Id. at ¶ 41.

The SURE system[6] is a statewide database of registered electors status which the DOS maintains.  Id. at ¶ 42.  It contains the name, address, voting district and signature of all

---

[5] Pennsylvania has used the SURE system for more than ten years.  See In re Nader, 865 A.2d 8 (Pa. Cmwlth. 2004).
[6] See 25 Pa.Con.Stat. 1222.  A glance at the Pennsylvania Web site for SURE will convey its comprehensive details, see  https://www.pavoterservices.state.pa.us/Pages/SurePortalHome.aspx.

registered voters -- identifiers that can be used in searches to verify the validity of signatures -- and it also identifies all electoral districts in which the voter is eligible to vote.  Id. at ¶¶ 43, 44, and 52.  Information is received via paper voter identification registration cards, manually keyed in with the signature scanned.  Id. at ¶¶ 46, 47.  This information is entered through county voter registration offices, which keep the paper registrations for two years.  Id. at ¶¶ 45, 48.

Voter registrations may also be received electronically through the Pennsylvania Department of Transportation ("PennDOT").  Id. at ¶ 49.  PennDOT registration cards contain a digitized signature and there is no paper version.  Id. at ¶ 50.  People remain registered in the system unless they ask to be removed or are removed from the voter rolls as provided by state or federal law.  Id. at ¶ 51.  According to the SURE system, there are about 8.2 million registered voters in Pennsylvania, id. at ¶ 54, with the 2010 census counting 9.9 million of voting age.  Id. at ¶ 55.  There are no entries in the SURE system for people who are eligible to vote but have not in fact registered.  Id. at ¶ 57.

The SURE system to some extent is publicly accessible in county voter registration offices and some courthouses, including all Commonwealth Court locations.  Id. at ¶ 56.  Parties challenging a signature may introduce other evidence, such as handwriting experts, in addition to the information available in the SURE system, id. at ¶ 59, and such experts use the SURE system, among other resources, to evaluate signatures.  Id. at ¶¶ 61, 62.

## IV.    The Green Party Plaintiffs' Amended Complaint

The Green Party plaintiffs assert twenty-three of their twenty-nine claims under 42 U.S.C. § 1983 alleging that the Election Code provisions, and the Commonwealth's interpretation of them, violate their constitutional rights, and contend that their nomination papers constitute "core political speech protected, in the absence of a modern compelling

governmental or regulatory interest, from state nullification under the First and Fourteenth

Amendments to the United States Constitution" and federal statutes.   AC at 3.   They raise their

remaining claims under the National Voter Registration Act ("NVRA"), 52 U.S.C. § 10101 et

seq., and Pennsylvania statutes.  Id. at 4.

   Plaintiffs argue that the Commonwealth's regulation prohibiting non-Pennsylvania

residents from executing the affidavit unconstitutionally impairs their First and Fourteen

Amendment rights by severely burdening their speech and doing so in a way "not narrowly

tailored to effectuate a compelling state interest."  Id. at 8.  They challenge this provision facially

and as-applied.

   The Commonwealth prints nomination paper forms with instructions for use, and those

are the only signature pages that can be used to get one's name on the ballot.  The Green Party

plaintiffs take constitutional issue with the Commonwealth's requirement on the nomination

paper that the affidavit must be executed "in the presence of a person empowered to take

acknowledgements (such as a notary public)," id. at 9; see also Ex. 9.  They contend this

represents an "unconstitutional signature certification fee. . . in clear violation of the First

Amendment's general prohibition on the imposition of any financial penalty upon those who

exercise a right guaranteed by the Constitution."  AC at 10.  It is undisputed that a notary public

in the Commonwealth charges "at a minimum" $5.00 per affidavit.  Id. at 9.  As the nomination

papers have limited signature lines, the Green Party plaintiffs estimate that the Commonwealth's

notarization requirement imposes a minimum $2,380.00 signature certification fee for "political

body" gubernatorial candidates (who need 16,639 signatures, gathered on nomination papers

with 35 signature lines) and a minimum $1,665.00 cost for "minor political party" gubernatorial

candidates (whose nomination papers contain 50 signature lines).  Id. at 10-11.  The plaintiffs

challenge the notarization requirement both facially and as-applied.

The Green Party plaintiffs also challenge the statutory requirement, under Subsection (d), that residents of different counties sign on different sheets.  Id. at 15.  They contend that this requirement imposes a severe burden on their speech and is not narrowly tailored to advance a compelling governmental interest.  Under the prevailing system when Section 2911 became law in 1937, challenged nomination papers were sent to each county voter registrar to compare challenged signatures against physical voter registration cards.  Id. at 16.  Pennsylvania has since implemented the SURE system pursuant to Act 3 of 2002.  Id.  SURE permits parties challenging signatures in Commonwealth Court to consult "[a] centralized, uniform statewide registry" on a computer portal accessible "at county voter registration offices and some courthouses, including all Commonwealth Court locations."  SF ¶ 56.  Accordingly, the plaintiffs contend that the current requirement for separate sheets no longer advances "any governmental interest."  AC at 17.  They maintain that there is no compelling state interest to oblige circulators to carry sixty-seven nomination papers (one per Pennsylvania county) or forego a willing elector's signature absent a nomination paper designating his or her county of residence.  Id. at 18.  The plaintiffs challenge the requirement for separate nomination paper for different counties facially and as-applied.

Subsection 2911(c) obliges every signer to record the year of signature.  The Green Party plaintiffs contest this requirement as constituting a severe burden for which there is no compelling governmental interest because the Commonwealth forms state the year in which they were printed.  Id. at 20.  The plaintiffs challenge this requirement facially and as-applied.[7]

---

[7] As noted earlier, Commissioner Marks testified at his deposition that the Commonwealth's revision of the nomination paper forms will require candidates to enter the election year to generate the necessary form, thereby generating a form on which the year is preprinted.  SF at ¶¶

The Green Party plaintiffs also challenge the prohibition limiting qualified electors from signing more than one nomination paper under § 2911(c), which they term a "presumptively invalid content based restriction on speech."  Id. at 24.  That subsection also provides that "[m]ore than one candidate may be nominated by one nomination paper and candidates for more than one office may be nominated by one nomination paper."  Id. at 24-25.  Therefore, they argue, the challenged provision forbids a qualified elector from signing nomination papers to place a gubernatorial candidate from one aspiring political party and a congressional candidate from a different minority party on the general election ballot.  They challenge this prohibition facially and as-applied.[8]

These plaintiffs also contend that the Commonwealth's failure to revise its nomination paper forms for non-presidential election years impairs their speech by reducing the space for signatures, thereby increasing the Green Party plaintiffs' notarization costs.  Id. at 26.  They challenge the Commonwealth's refusal to revise the form as-applied.[9]

The Green Party plaintiffs challenge as "chilling" of First Amendment rights the inclusion of the following "Note" on the bottom of their nomination paper forms, which they characterize as a threat:

> While the Secretary of the Commonwealth will not reject nomination papers on the basis that the circulator does not reside in the district specified in the nomination paper, the candidate(s) should be aware that the nomination papers may be challenged in Commonwealth Court on the basis that the circulator does not

25, 28.  If that has indeed occurred, Counts VII and VIII would be moot, and we will grant plaintiffs leave to amend if mootness has occurred.

[8] In the amended motion for partial summary judgment, plaintiffs also challenge as an equal protection violation the Commonwealth's application of this provision to aspiring parties alone.

[9] Commissioner Marks testified at his deposition that the Commonwealth will generate an alternative form in non-presidential election years, without a presidential elector box, that will allow for more signature lines.  Id. at ¶ 32.  As he was speaking of future action, Count XI may also be moot.

reside in the district.

Id. at 29; see also Ex. 8 at 2.  They state that on January 22, 2014 the Commonwealth's Office of the Attorney General advised the defendants that "there was no legal basis to support the circulator residency requirement" and instructed them to cease enforcing it for all offices.  Id. at 28; see also Ex. 11.  The plaintiffs challenge the inclusion of this Note facially and as-applied.[10]

The plaintiffs contest Subsection (a)'s provision permitting only "qualified electors" record their signatures on nomination papers.  They contend this restriction "places an exceedingly severe burden" on their speech and that of Pennsylvania citizens who "wish to sign plaintiffs' nomination papers to effect political change" and "exercise their rights to engage in protected speech to refuse to register to vote."  Id. at 33.  They argue that the Commonwealth's enforcement of the registration requirement "is not justified by any regulatory interest" because it limits the universe of people to whom plaintiffs may circulate their papers.  Id. at 33-34. Because nomination papers are presumed valid when the Commonwealth accepts them and signatures are challenged by private objectors, not the Commonwealth, they argue that Pennsylvania has no regulatory interest in maintaining the registration requirement.  Id. at 37-38.

As to this "qualified elector" provision, the plaintiffs also contend that reliance on the SURE system to contest signatures "is no longer constitutionally tenable" because electronic key-pads used to sign and then transfer signatures render the signatures illegible and subject to strike.  Id. at 39.  They urge us to adopt the distinction crafted in Morrill v. Weaver, 224 F. Supp. 2d 882 (E.D. Pa. 2002) (Van Antwerpen, J.), between a "qualified elector" (defined by reference in the Pennsylvania Constitution) and a "registered elector," that is, a "qualified elector who is

---

[10] Commissioner Marks also testified that forms for future elections would no longer bear the "Note" at issue here.  Id. at ¶¶ 33, 34.  If that is indeed the case by now, Counts XII and XIII would be moot.

registered to vote."  AC at 43; see also Morrill, 224 F. Supp. 2d at 896 n. 16.  Judge Van

Antwerpen concluded, "This distinction suggests that there are qualified electors who are not

registered to vote, and we now interpret § 2911(d) accordingly," id. (emphasis in original) -- a

conclusion the plaintiffs would have us adopt as well.  They challenge both facially and as-

applied the Commonwealth's enforcement of Subsection (a)'s prohibition on signatures from

unregistered qualified electors.

In the alternative, plaintiffs seek a determination that any signatures on nomination

papers that match those in the SURE system should be deemed protected speech and not be

struck, even if the signer failed to record the other information required under 25 Pa. Stat. Ann. §

2911(c) or some other person filled in that secondary information.  AC at 45-47.  Requiring

information such as residence, date, or printed name, they argue, "does nothing to corrupt or call

into question the validity of the signature" but merely represents a " 'form-over-substance'

ministerial requirement", id. at 46, 48.  The plaintiffs challenge facially and as-applied "[t]he

authority of defendants to strike signatures" that match those of qualified electors in the SURE

system, id. at 141.  They also contest defendants' "authority . . . to strike signatures" when third

parties have filled in secondary information as facial and as-applied challenges.

The Green Party plaintiffs challenge facially and as-applied the defendants' enforcing

Subsection (c) to strike signatures if the signer records a current address different from that on

record in the SURE system.  Id. at 52.  They similarly challenge defendants' enforcement of that

provision to strike signatures where the signer registered to vote after signing plaintiffs'

nomination papers but within the time permitted by law.  And the plaintiffs argue that the NVRA

prohibits the defendants from striking otherwise valid signatures of registered "qualified

electors" who have moved within the same county and failed to record their new address.  Id. at

53.  Finally, they assert state law claims alleging that by striking nonconforming signatures, imposing the sworn affidavit requirement, and adopting a restrictive definition of "qualified elector", the defendants' actions exceed the authority delegated to them under the Pennsylvania Election Code.

Plaintiffs seek declarations that the challenged provisions of the Election Code are unconstitutional, id. at 174-178,  and seek injunctions precluding enforcement of the challenged provisions "against all plaintiffs now and in the future," id. at 178.  They also move the Court to order the Commonwealth to revise the plaintiffs' nomination paper forms to remedy the alleged infirmities.  Id. at 178-181.  Finally, they seek an award of attorneys' fees.

At issue before us in the Green Party plaintiffs' amended motion for partial summary judgment are claims as to Counts I-IV, VI, IX-X, XIV-XXV, and XXVIII and XXIX.[11]  The defendants seek judgment in their favor on all counts.

## V.      Applicable Law

### A.      Facial and As-Applied Challenges

Facial challenges and as-applied challenges fundamentally differ.

A plaintiff asserting a facial challenge "seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question."   City of Chicago v. Morales, 527 U.S. 41, 55 n. 22 (1999).  Thus, a plaintiff succeeds in a facial challenge only by showing there is "no set of circumstances" that exists under which the statute at issue would be valid, Heffner v. Murphy, 745 F.3d 56, 65 (3d Cir. 2014) -- a "particularly demanding" standard.

---

[11] The Green Party plaintiffs do not seek summary judgment on their facial challenges to the requirement for separate paper nomination sheets for each county (Count V); the requirement to record the year (Counts VII and VIII); the inclusion of presidential year information on off-year nomination papers (Counts XI); the inclusion of the printed "Note" (Counts XII and XIII); and two state law claims.

United States v. Salerno, 481 U.S. 739, 745 (1987).

    The Supreme Court disfavors facial challenges for several reasons.  Such challenges tend

to arise before the State has had an opportunity to implement the statute in question or its courts

have been able to construe or narrow that law in actual disputes.  As the Court explained in

Washington State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008), "Claims

of facial invalidity often rest on speculation" about the reach of a statute and "run contrary to the

fundamental principle of judicial restraint" by anticipating the meaning of a constitutional rule

before it has been decided.  Because the remedy for a successful facial challenge is the complete

invalidation of a law, "we must be careful not to go beyond the statute's facial requirements and

speculate about 'hypothetical' or 'imaginary' cases."  Id.

    By contrast, as our Court of Appeals has held, "[a]n as-applied attack ... does not contend

that a law is unconstitutional as written but that its application to a particular person under

particular circumstances deprived that person of a constitutional right."  United States v.

Marcavage, 609 F.3d 264, 273 (3d Cir. 2010).  The distinction, then, between facial and as-

applied challenges goes to the scope of the statute's claimed constitutional infirmity and the

breadth of the remedy sought.  See Citizens United v. Federal Election Commission, 558 U.S.

310, 331 (2010).  The remedy for a facial challenge is the broad invalidation of the statute in

question, but the remedy for an as-applied challenge bars its enforcement against a particular

plaintiff alone under narrowed circumstances.  See CMR D.N. Corp. v. City of Philadelphia, 703

F.3d 612, 624 (3d Cir. 2013); accord Voting for America, Inc. v. Andrade, 488 F. App'x 890,

916-17 (5th Cir. 2012).  Our Court of Appeals has also cautioned that district courts granting

injunctions in such cases "should craft remedies 'no broader than necessary to provide full relief

to the aggrieved plaintiff.'"  Belitskus v. Pizzingrilli, 343 F.3d 632, 649-50 (3d Cir. 2003)

(quoting McLendon v. Continental Can Co., 908 F.2d 1171, 1182 (3d Cir. 1990)).  For that

reason, the "usual judicial practice" is to address an as-applied challenge before a facial

challenge.  United States v. Mitchell, 652 F.3d 387, 406 (3d Cir. 2011) (internal citations

omitted).

 The defendants dispute the nature of the Green Party plaintiffs' challenge.  They contend

that the plaintiffs "can only pursue a facial challenge given the arguments they advance and

relief they seek" because their arguments "preclude the idea that the provisions at issue have a

'plainly legitimate sweep' or that circumstances exist under which [they] would be valid. "  Def.

MSJ at 7 (quoting Chula Vista Citizens for Jobs and Fair Competition v. Norris, 755 F.3d 671,

683 n. 12 (9th Cir. 2014).

 We do not agree.  The Green Party plaintiffs seek injunctions precluding enforcement of

the challenged provisions "against all plaintiffs now and in the future" -- certainly facial

challenges.  See AC at 178.  But they also seek remedies specific to the Libertarian and Green

parties, such as relief from the "In-State Witness" requirement and the obligation to file separate

nomination sheets for signers resident in different counties.  In short, the Green Party plaintiffs

find fault with certain Election Code provisions as-applied to themselves and to all others, but

seek certain remedies for themselves alone, a quintessential "as-applied" challenge.

 Accordingly, we will analyze the Green Party plaintiffs' challenges initially as "as-

applied" challenges that require them to show that under the particular circumstances they alone

were deprived of a constitutional right, Marcavage, 609 F.3d at 273, before considering them as

facial challenges.  Mindful of the Supreme Court's disapproval of district courts that act before a

state's highest court construes or narrows a statute in a live controversy -- as is the case here --

we will refrain from granting relief to the Green Party plaintiffs relief as to their facial

challenges.  In so doing, we will craft any remedies to provide relief to the Green Party plaintiffs only but no broader.

### B.      The Level of Scrutiny

Restricting political parties' access to the ballot infringes citizens' fundamental rights of association and speech protected by the First and Fourteenth Amendments.  But States have an equally fundamental right, rooted in Article I of the United States Constitution, to regulate the time, place and manner of their own elections.  The States' interests lie in limiting the number of candidates in an election to avoid ballot overcrowding, preserving the fairness and integrity of the electoral process, and avoiding confusion, deceptions, or frustration of the democratic process.  See Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986).  States may require candidates to make "a preliminary showing of significant support" to qualify for a spot on the ballot.  Id. at 194.   The question for the Court, when States restrict access to the ballot, is whether the burdens imposed to gain such access fall unequally and unjustifiably on certain parties.  Williams v. Rhodes, 393 U.S. 23, 30-31 (1968).

Ballot access cases oblige us to balance those countervailing rights rather than apply a specific level of scrutiny.  Rogers v. Corbett, 468 F.3d 188 (3d Cir. 2006).  We must weigh "'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which  those interests make it necessary to burden the plaintiff's rights.'" Burdick v. Takushi, 504 U.S. 428, 434 (1992) (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)).  Under this flexible standard, the rigorousness of our inquiry depends upon the extent to which a challenged provision burdens First and Fourteenth Amendment rights.

The Supreme Court summarized in <u>Burdick</u> the balance required to determine the level of scrutiny:

> [W]hen those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance."  But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

<u>Id</u>. at 434 (internal citations omitted).

In short, we look at the nature of the alleged rights involved and the burdens imposed on them to determine whether the complained-of burden is justified.  <u>Rogers</u>, 468 F.3d at 194.  Under the <u>Burdick/Anderson</u> test, we begin with the nature of the burden.  If we determine that strict scrutiny is applicable, the Commonwealth then has the burden to prove the existence of a compelling interest.  <u>See</u>, <u>e.g.</u>, <u>Federal Election Comm'n v. Wisconsin Right to Life, Inc.</u> 551 U.S. 449, 465 (2007).  It must then show that its law is "narrowly tailored to achieve that interest."  <u>Id.</u> at 464.  But "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review" under the <u>Burdick/Anderson</u> test.  <u>Rogers</u>, 468 F.3d at 194 (internal citation omitted).  Lesser burdens receive less exacting scrutiny and the State need not establish a compelling interest in order to prevail.  Regrettably, "[n]o bright line separates permissible election-related regulation from unconstitutional infringements." <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 359 (1997).   As the Seventh Circuit cautioned, "The Constitution does not prohibit the States from enacting laws which incidentally burden candidates, for such a proscription would similarly preclude the regulation of elections and efforts to ensure their integrity."  <u>Krislov v. Rednour</u>, 226 F.3d 851, 859 (7th Cir. 2000) (internal citations omitted).  "Because elections must be regulated to remain free from fraud and

coercion, some latitude is given to regulations designed to serve these purposes," id.

Ballot access "may be limited in accord with appropriate state interests, and . . . limitations imposed in furtherance of such interests need not be the most narrowly drawn as long as they are nondiscriminatory and reasonable in light of the relevant burdens." Rogers, 468 F.3d at 194.  If we deem the burden reasonable and the Commonwealth's interest valid, we will not oblige the Commonwealth to impose its burden by the least restrictive means.  Id. at 195.

## VI.    Discussion

### A.    In-State Witness Requirement (Counts I and II)

Section 2911(d) requires the circulator to be a "qualified elector" of the Commonwealth and attest that he or she has personal knowledge of the validity and circumstances of the recorded signatures which effectively prohibits out-of-state circulators from collecting signatures on nomination papers.  In our July 31, 2014 Order, we enjoined the defendants from enforcing this provision in accordance with Libertarian Party of Virginia v. Judd, 718 F.3d 308 (4th Cir. 2013).  The Green Party plaintiffs seek a definitive declaration that this statutory requirement is unconstitutional, Pl. Am. MSJ at 11, and argue that it burdens their candidates because it "drastically reduces the number of persons. . . available to circulate petitions."  Id. at 16.  As Green Party State Chairman John J. Sweeney attested,

> Green Party members from New Jersey and New York expressed a willingness to assist in the circulation of my nomination papers and [those] of Paul Glover, the Green Party candidate for Governor, but were not willing or able to do so under the requirements that they could only [do so] along with an in-state resident of Pennsylvania.  The time and effort to coordinate schedules between the in-state circulator and the willing out-of-state circulator was too much to overcome to permit out-of-state circulators to actually circulate my nomination papers in 2014.

Id. at Ex. A, ¶ 13.  The plaintiffs also contend that the restriction deprives out-of-state circulators

21

of the opportunity to persuade potential Pennsylvania voters of their views.  Pls. Am. MSJ at 17.

They aver it narrows the form of support like-minded circulators can offer their candidate, id.,

and thus voters are deprived of a range of speech outside what the two major parties provide.  Id.

at 19.  Because of the severity of the burden, they argue, strict scrutiny would apply and we

should hold that the Commonwealth has failed to advance a compelling governmental interest in

a narrowly tailored fashion.  Id. at 20-23.

The defendants contend that the burden is a minimal one outweighed by the

Commonwealth's interest that nomination paper circulators be subject to the Pennsylvania

courts' subpoena power.  Def. MSJ at 11-12.  They assert the Commonwealth's "significant

interest . . . in fairly resolving challenges to nomination papers."  Id. at 12.  They ask that we lift

our order enjoining them from enforcing this proscription against out-of-state circulators and

enter judgment in their favor.  Id.

Our Court of Appeals has not considered the validity of the In-State Witness requirement.

In our July 31, 2014 Order we relied on the reasoning of the Fourth Circuit in Judd and held such

residency requirements unconstitutional.  We do so again here.  We apply the strict scrutiny

standard because the character and magnitude of the asserted injury outweighs the

Commonwealth's interests as a justification for the burden it imposes.  The Commonwealth's

residency requirement is not narrowly tailored to advance a state interest of compelling

importance.  "As the law has developed . . ., a consensus has emerged that petitioning restrictions

like the one at issue here are subject to strict scrutiny analysis."  Judd, 718 F.3d at 316-17 (citing

cases).[12]

---

[12] See Yes on Term Limits, Inc. v. Savage, 550 F.3d 1023 (10th Cir. 2008) (applying strict
scrutiny to overturn Oklahoma prohibition on nonresident circulators of initiative petitions);
Nader v. Brewer, 531 F.3d 1028 (9th Cir. 2008) (invalidating under strict scrutiny analysis, inter

The circumstances in Judd are similar to those here.  Under Virginia law, signatures on nominating petitions must be witnessed either by the candidate personally or by a person who is a "resident of the Commonwealth. . ." , Judd, 718 F.3d at 311.  The Judd plaintiffs (some of the same entities present before us) contended that this residency requirement impermissibly burdened their First Amendment rights by forcing out-of-state circulators to work in tandem with Virginia residents, thereby reducing the pool of available circulators.  Id.  The Virginia State Board of Elections (the "Board") contended this requirement served the Commonwealth's interest in policing fraud by arguing (1) it is "less difficult" to confirm the identity of resident witnesses; (2) Virginia residents may be subpoenaed to answer questions under oath about the circulation process or be criminally prosecuted; and (3) residents are "simply easier to locate." Id. at 317.  The plaintiffs countered that the Commonwealth could compel nonresidents to enter into "a binding legal agreement" that they would comply with any subpoena as a condition for being able to witness nominating petition signatures.  Id. at 318.  See also Nader v. Brewer, 531 F.3d 1028, 1037 (9th Cir. 2008) ("Federal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be a more narrowly tailored means than a residency

---

alia, an Arizona residency requirement for circulator witnesses).  Nader v. Blackwell, 545 F.3d 459 (6th Cir. 2008) (declaring unconstitutional, as failing strict scrutiny, Ohio ban on nonresidents circulating nominating petitions); But see Voting for America v. Steen, 732 F.3d 382 (5th Cir. 2013) (upholding a Texas residency requirement for so-called volunteer deputy registrars who solicit voter registration but not on strict scrutiny).  In Steen, the Fifth Circuit distinguished between voter registration drives and the circulation of petitions to hold that the residency restriction did not inhibit political discussion or burden the exchange of ideas.  See id. at 389, 392-93.  The burdens imposed by the residency provisions, the Fifth Circuit concluded, were minimal:  "Unlike the requirements struck down in petition circulator cases, the Texas provisions do not directly reduce the number of voices by preventing out-of-state residents from advocating political or civic messages." Id. at 393 (citing Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, 193 n. 15 (1999)).  See also Initiative & Referendum Institute v. Jaeger, 241 F.3d 614 (8th Cir. 2001).

requirement to achieve the same result.")

The Fourth Circuit held that the Board's ban on nonresident witnesses, however efficacious in combatting fraud, was nonetheless "insufficiently tailored to constitutionally justify the burden it inflicts."  Judd, 718 F.3d at 318.  It found that the Board had "produced no concrete evidence of persuasive force" explaining why the plaintiffs' alternative proposal ("manifestly less restrictive of their First Amendment rights") would be unworkable or impractical, and concluded that the requirement failed strict scrutiny and was therefore unconstitutional.  Id.

Similarly, the Seventh Circuit, when it considered a cognate statute on circulators in Illinois that it invalidated under application of strict scrutiny, noted "other mechanisms the State currently employs to serve the statute's purpose, as well as other, less restrictive means it could reasonably employ.  The State need not use the least restrictive means available, as long as its present method does not burden more speech than is necessary to serve its compelling interests." Krislov, 226 F.3d at 863 (internal citations omitted).  In Krislov, the Board of Elections argued the statute at issue ensured that candidates had sufficient support to merit ballot access; resident circulators (required to reside in the same district as the candidate) would likely be aware of the district borders and solicit only valid signatures; and, as a general proposition, the provision would help ensure the integrity of the process.  Id. at 863-65.  The Seventh Circuit found that these means were not narrowly tailored.  Id.   It also pointedly observed that "a resident would likely be at the same risk of obtaining an invalid signature. . . as would a non-resident."  Id. at 865.

We find precisely such deficiencies in the Commonwealth's position before us.  There is no question that the In-State Witness requirement sharply limits the reach of the Green Party

plaintiffs' message.  The Commonwealth would have us rely on <u>Morrill</u> in which our former colleague struck down Section 2911(d)'s requirement that affiants be registered voters living in their candidates' electoral district.  The Commonwealth argues that Judge Van Antwerpen "acknowledged the legitimate purpose of requiring circulators to be Pennsylvania residents" because the Pennsylvania courts' subpoena power would not extend to non-Pennsylvania residents.  Def. MSJ at 11.  But the Green Party plaintiffs have, like their Virginia colleagues, offered to subject out-of-state circulators to the jurisdiction of Pennsylvania courts "for the express purpose of any investigative and/or judicial procedure with respect to any alleged violation(s) of Pennsylvania election law." Pl. Am. MSJ Ex. H, ¶ 10 (Decl. of William Redpath); <u>see</u> <u>also</u> <u>id.</u> at 22..

The defendants assert the Commonwealth's interest in subjecting circulators to Pennsylvania courts' subpoena power in case of contests, but they have proffered no reason why the Green Party plaintiffs' offer to subject out-of-state circulators to the Pennsylvania courts' jurisdiction is unworkable.  And we bear in mind the Commonwealth's repeated incantations that private parties, and <u>not</u> the Secretary, challenge nomination paper signatures, SF at ¶¶ 38, 39. The Courts of the Commonwealth certainly have a compelling interest in fairly resolving these challenges, but they have other mechanisms better suited to resolving challenges to nomination papers, namely, objectors' reliance on signature comparisons in the SURE system.

We hold that the In-State Witness requirement is not so narrowly tailored as to effectuate the Commonwealth's compelling interest in fairly resolving signature challenges.  The In-State Witness requirement is unconstitutional as-applied to the Green Party plaintiffs.  We will enjoin the defendants from enforcing this provision of Section 2911(d) as to the Green Party plaintiffs.

But we will not impose a remedy broader than is necessary to provide full relief to the

aggrieved plaintiffs, <u>Belitskus</u>, 343 F.3d at 650.  The fundamental principle of judicial restraint

that the Supreme Court has consistently promoted must leave room for the Commonwealth's

courts to construe other applications of this provision.  We will not speculate that there is no set

of circumstances under which the challenged provision may withstand constitutional scrutiny.

We will therefore not invalidate this provision entirely or enjoin the Commonwealth from

applying the statute to others who are not plaintiffs here. We will grant defendants' motion for

summary judgment to the extent plaintiffs press their facial challenge.

### B.      <u>Notarization Requirement (Counts III and IV)</u>

The plaintiffs' nomination papers, as the Commonwealth prints them, require that each

sheet must be notarized.  <u>See</u> AC at Exs. 7 and 9 ("<u>Every</u> sheet of the nomination paper must

have the 'Affidavit of Qualified Elector' filled in, signed and notarized in the presence of a

person empowered to take acknowledgments <u>after</u> all signatures have been obtained") (emphasis

in original).   The Green Party plaintiffs contend that the notarization requirement exceeds

defendants' authority under Subsection (d), which requires only that an affidavit be appended to

each sheet.  Pl. Am. MSJ at 24.   They seek a determination that the notarization requirement is

akin to a mandatory filing fee and thus is unconstitutional.

Under the <u>Burdick/Anderson</u> balancing test, we begin by considering the burden's

contours.

The Green Party plaintiffs contend that the notarization requirement burdens these near-

indigent political entities with costs akin to a financial penalty because notaries charge a

minimum of $5.00 per affidavit.  <u>Id.</u> at 26; <u>see</u> <u>also</u> Ex. A at ¶ 22, Decl. of John J. Sweeney ("the

costs associated with notarizing every nomination paper that I circulate prohibit[] me from being

able to gather the number of signature[s] that I would otherwise like to gather because there is a

limit [on what] I can personally afford").    Based on the signatures each aspiring party needs to secure a position on the general election ballot, minimum notary expenses are $2,380.00 for a Green Party statewide candidate ($.14285 per signature) and $1,665.00 for a Libertarian Party statewide candidate ($.10 per signature).[13]  AC at 10-11.  That "far exceeds" the total amount of funds either party has in their respective bank accounts.  Pl. Am. MSJ at 30.  As to the defendants' interests, plaintiffs describe the notarization rule as a "meaningless ministerial requirement" because the defendants expressly represented to our Court of Appeals in Aichele that the Commonwealth plays no role in verifying signatures.  Id. at 24; see also Aichele, 757 F.3d at 366.

The Commonwealth calls the notarization requirement a "safeguard against fraud in the signature gathering process."  Def. MSJ at 13.  As Commissioner Marks stated in his deposition, "[Y]ou have an individual . . .who's gone out and collected signatures and they're attesting to the fact that they did some due diligence in collecting those signatures, and that. . . everyone who signed that nomination paper signed it, was aware of what they were signing, and that their residences are accurate, to the best of their knowledge.  So I think that process is to ensure that an individual is taking responsibility. . .for what's on that nomination paper[.]"  Pl. Am. MSJ, Ex. C (Marks Dep.) at 68:13-24.

The defendants also contend that the term "affidavit" in Section 2911(d) "implies that it would have to be a notarized document."  Id. at 69:11-12.  To that end, they rely on the Commonwealth's definition of "affidavit" in its general rules for statutory construction:

> A statement in writing of a fact or facts signed by the party making
> it, sworn to or affirmed before an officer authorized by the laws of
> this Commonwealth to take acknowledgments of deeds, or

---

[13] The cost difference arises from the greater number of signature lines on the Commonwealth's nomination papers for minor political parties such as the Libertarian Party. AC at 11.

> authorized to administer oaths, or before the particular officer or
> individual designated by law as the one before whom it is to or
> may be taken, and officially certified to in the case of an officer
> under his seal of office.

1 Pa. Cons. Stat. § 1991, Def. MSJ at 13.  The defendants deem safeguarding against fraudulent signatures to be a legitimate interest and having the petitions notarized constitutes what they regard as a "minimal burden" on the plaintiffs.  Id. at 15.  And they propose that the plaintiffs minimize their costs by having their circulators obtain notary licenses or even have a single notary certify all papers.  Id. at 13; see also Pl. Am. MSJ Ex. C at 69.  Defendants urge us to contrast the minimal burden they assert is imposed on the plaintiffs with the Commonwealth's requirement with Puerto Rico's requirement, which the First Circuit held unconstitutional because (1) every signature had to be notarized under Puerto Rico law, imposing a financial burden the District Court estimated at $1.5 million, and (2) only lawyers in Puerto Rico can be notaries, which made it that much more cumbersome for the candidate to collect and validate signatures.  Perez-Guzman v. Gracia, 346 F.3d 229, 247 (1st Cir. 2003).

Under the Supreme Court's ballot access jurisprudence, mandatory filing fees are a legitimate tool for a State to limit ballot access.  Lubin v. Panish, 415 U.S. 709, 713 (1974).  But the Supreme Court invalidated a Texas statute that set up a mandatory filing fee without providing any other means of ballot access.  See Bullock v. Carter, 405 U.S. 134 (1972).  In Lubin, the Supreme Court held that the state's interest in limiting ballot access "must be achieved by a means that does not unfairly or unnecessarily burden a minority party's. . . equally important interest in the continued availability of political opportunity."  Lubin, 415 U.S. at 716.

And Belitskus held that:

> [B]ecause fee statutes can "operate to exclude some potentially
> serious candidates from the ballot without providing them with any
> alternative means of coming before the voters," the Court held that,

28

> "in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay."

Belitskus, 343 F.3d at 642  (quoting Lubin, 415 U.S. at 718).

Our Court of Appeals has not considered the constitutionality of a notarization requirement.  But it has considered the legitimacy of other fees imposed under the Election Code in light of the Supreme Court's ballot access jurisprudence.  In Belitskus, our Court of Appeals considered the burden of mandatory filing fees, ranging from $5 to $200, imposed on indigent minority parties.  Applying the Burdick/Anderson balancing test, the Third Circuit concluded that the fees "severely burdened" the indigent candidates as did "the Commonwealth's failure to provide a reasonable alternative means of ballot access."  Id. at 644, 645.  The Commonwealth argued unpersuasively that the regulation limited the number of candidates on the ballot and defrayed election costs.  Our Court of Appeals held the former reason "extraordinarily ill-fitted to that goal" and the latter impermissible, id. at 646, and regarded the absence of a reasonable alternative means of ballot access as "the primary issue" in Belitskus.  Id. at 647.  "By failing to provide such an alternative, the Commonwealth has made economic status a decisive factor in determining ballot access [and] therefore has run afoul of the Supreme Court's ballot access jurisprudence."  Id.

Guided by our Court of Appeals's reasoning in Belitskus, we conclude that the Commonwealth's notarization requirement contravenes established ballot access jurisprudence. Minority parties and political bodies are uniquely burdened by the notarization requirement.  The Green Party plaintiffs have supplied evidence that the burden of this expense is severe as to them.  We must therefore apply strict scrutiny to determine whether the Commonwealth's requirement is "narrowly drawn to advance a state interest of compelling importance."  Burdick,

504 U.S. at 434.

To be sure, the Commonwealth has a compelling interest in preventing "fraud in the signature gathering process."  Def. MSJ at 13.  But the notarization requirement the defendants impose is not narrowly tailored to achieve that end.  To begin with, the defendants avowedly play no direct role in verifying signatures.  <u>Aichele</u>, 757 F.3d at 366.  That task falls to private entities who are not parties to this suit.  Such objectors likely would review signatures by doing comparison searches on the SURE system under the auspices of the Commonwealth Court.  <u>Id.</u> at 354 n. 10.  Defendants present no evidence that the notarized affidavits play any part in signature challenges -- either to bolster or attack a signature's validity.  In short, notarization is ill-fitted to preventing fraud during signature gathering or helping resolve signature challenges.

 We are also unpersuaded by the defendants' reliance on the statutory definition of <u>affidavit</u>.  That person is deemed authorized and empowered "by the laws of this Commonwealth to take acknowledgements of deeds or authorized to administer oaths or designated by law as the one before whom it is to or may be taken."  1 Pa. Cons. Stat. § 1991 -- in this case, the notary.  The defendants offer no evidence as to why we should narrowly construe § 2911(d) as meaning to require a notary when the governing definition supplies a broader meaning.

Finally, the Commonwealth has not proffered a reasonable alternative means of ballot access to the notarization requirement.[14]  By failing to provide such an alternative, the Commonwealth transgresses what the Supreme Court has held in ballot access cases.

We hold that the notarization requirement is not narrowly tailored to effectuate the Commonwealth's compelling interest in safeguarding against voter fraud.  The notarization

---

[14] The Green Party plaintiffs draw our attention to 18 Pa. Cons. Stat. § 4904(a)(1) which provides that one can execute an unsworn affidavit subject to a criminal penalty with certain conditions.  Pl. Am. MSJ at 35.

requirement is a constitutionally impermissible impediment to ballot access and unconstitutional as applied to the Green Party plaintiffs.  We will enjoin the defendants from enforcing their interpretation of Section 2911(d), which we find does not impose this requirement.  As above, we will not craft a broader remedy than necessary to provide full relief to the Green party plaintiffs only.

We cannot conclude that no set of circumstances exists under which such a requirement could be constitutional and therefore will deny plaintiffs' facial challenge.   We will therefore grant defendants' motion for summary judgment as to plaintiffs' facial challenge.

C.      **The Requirement For Separate**
        **<ins>Nomination Papers For Each County (Count VI)</ins>**

Section 2911(d) also requires that different nominating sheets be used for signers from different counties.  The Green Party plaintiffs contend that this provision is a "relic from the time when nomination paper signatures were sent to each individual county by Commonwealth Court" so each county could check challenged signatures against their paper records.  Pl. Am. MSJ at 36-37.  Enforcement of this regulation severely impairs their speech, they claim, because circulators must either manage sixty-seven separate nomination paper sheets (<u>i.e.</u>, one per Pennsylvania county) or forego signatures.  <u>Id.</u> at  39; <u>see</u> <u>also</u> Ex. B (Decl. of Green Party member Carl Romanelli) (attesting to the impossibility of carrying or efficiently managing nomination papers for more than a few counties).  <u>See also</u> Ex. A (Decl. of John J. Sweeney) at ¶¶ 27-29.  The plaintiffs contend that this regulation does not advance any governmental interest because county election officials now upload and maintain voter registration information on SURE.  <u>Id.</u> at 37, 40.

The defendants question whether this regulation poses any burden because "the reality is

that a circulator gathering signatures . . . is most likely to encounter residents of that county or the surrounding counties."  Def. MSJ at 15.  Lifting this requirement, they contend, would create confusion for the Secretary, who is tasked with processing the nomination papers by the August 1 deadline.  Under the present system, they aver, she can determine by looking at a nomination paper submitted for either a statewide or local candidate whether the local candidate has enough signatures from residents in his or her district because they would be separated into counties.  Id. at 16.  Otherwise, she would have to review all of the nomination papers submitted to search for each endorsement of a local candidate.  They contend the submission of county-by-county nomination papers constitutes a minimal burden.

Under the Burdick/Anderson balancing test, we begin by considering the contours of the burden.

Plaintiffs assert that managing a sheaf of sixty-seven sheets of paper poses an undue burden because circulators cannot carry or efficiently manage nomination papers for more than a few counties at a time.  They contend this requirement does not advance a compelling governmental interest.

Defendants assert this regulation poses a minimal burden.  They also contend -- but offer no evidence in support -- that lifting this burden would create confusion and delay when signatures must be tallied by August 1.  Defendants raise a genuine issue of material fact but have failed to provide any evidence that the governmental interest they assert is a compelling one.

It is well-established that summary judgment is only appropriate if there are no genuine issues of material fact.  In cross-motions for summary judgment, each party as the movant bears the burden of establishing that no genuine issue of material fact exists and that he is entitled to a

judgment as a matter of law.  Considering plaintiffs' motion and viewing the facts in the light most favorable to the defendants, we find that there are genuine issues of material fact as to the degree of burdensomeness and the extent of the governmental interest involved.  The defendants, of course, are the party that does not have the burden of proof on the underlying claim and, as such they have no obligation to produce evidence negating their opponents' case.  But they must point to the lack of evidence supporting the non-movant's claim.  <u>National State Bank</u>, 979 F.2d at 1582.  They have failed to do so.  Nor have defendants provided affidavits or other admissible evidence in support of their contention that confusion would ensue were we to enjoin enforcement of this regulation.

We will therefore deny both parties' motions because there is a genuine issue of material fact as to the Commonwealth's interest in requiring separate nomination papers by county.  We will oblige both sides to submit by the end of this month detailed affidavits as to the impact of the requirement for separate nomination papers for each county in order for us to dispose of the parties' cross-motions as to this issue.

### D.     The Prohibition on "Qualified Electors" <u>Signing More Than One Nomination Paper (Counts IX and X)</u>

Section 2911(c) prohibits "qualified electors" from signing more than one nomination paper for each political office to be filled in an election year.  It also provides that "More than one candidate may be nominated by one nomination paper and candidates for more than one office may be nominated by one nomination paper," which the plaintiffs call the "Stacking Provision."

The Green Party plaintiffs contend that this provision effectively prohibits a member of one aspiring party from signing nomination papers for a candidate from another aspiring party

(for another office), if that nomination paper also includes a candidate from his own party, as one signature will invalidate the other.  Pl. Am. MSJ at 42.  For example, Green Party State Chairman John J. Sweeney states he has been willing to sign nomination papers for Libertarian or Constitution Party candidates unopposed by a Green Party candidate, but is prohibited from signing more than one nomination paper per political office.  Id., Ex. A (Decl. of John J. Sweeney).  As he explains,

> The Pennsylvania Election Code prohibition against signing more than one nomination paper per political office, in combination with the rule permitting political parties to list more than one candidate on each nomination paper, effectively prohibits me from supporting candidates from other political parties for office not being contested by the Green Party of Pennsylvania.

Id. at ¶ 34.  The plaintiffs argue this ban is a content-based restriction on speech that is presumptively invalid.  Pl. Am. MSJ at 43.  They contest whether it serves the Commonwealth's interest in avoiding "ballot clutter" since the ballot has never had more than seven candidates qualifying for statewide elections on it.  Id.  They also contend that the requirement violates the Equal Protection Clause of the Fourteenth Amendment because members of major political parties may sign nomination papers and also cast a ballot for their candidate in primaries, but members of aspiring parties may only support their candidate on a single nomination paper for the general election.  Id. at 45.

The Commonwealth defendants respond that "[i]t is not clear how this restriction amounts to a burden" since each party presumptively seeks to place its own candidate on the ballot.  Def. MSJ at 18.  They contend that any goal of "getting as many minor political party and political bodies on the ballot . . . is not a legitimate goal."  Id.  The Commonwealth has a significant interest in conducting orderly elections, they argue, which more than counterbalances the minimal burden on the plaintiffs.

34

It is well-established that the States have a strong interest in limiting ballot clutter and preserving the integrity of the nomination process. As the Seventh Circuit held in Krislov, 226 F.3d at 859, "The Constitution does not prohibit the States from enacting laws which incidentally burden candidates, for such a proscription would similarly preclude the regulation of elections and efforts to ensure their integrity." One way in which States do this is through regulations that force candidates to make "a preliminary showing of significant support" in order to qualify for a place on the ballot. Munro, 479 U.S. at 194. But those regulations must be evenly applied to all parties.

In Timmons, 520 U.S. at 353-54, the Supreme Court weighed the constitutionality of Minnesota's prohibition against candidates appearing on the ballot of more than one party, or fusion. Fusion is the electoral support of a single candidacy by two or more parties. Id. at 353 n.1 (quoting Argensinger, "A Place on the Ballot": Fusion Politics and Antifusion Laws, 85 A. Hist. Rev. 287, 288 (1980).[15] Applying the familiar Burdick/Anderson test to weigh the electorate's First Amendment rights of association and expression against Minnesota's interest in reasonable regulations to reduce "campaign-related disorder," Timmons, 520 U.S. at 358, the Supreme Court held that the fusion ban on all parties did not severely burden the New Party because it only excluded support of "those few individuals who both have already agreed to be another party's candidate and also . . . themselves prefer that other party." Id. at 363. The States, the majority concluded, have a "permissible choice" to promote regulations that favor the traditional two-party system. Id. at 366 n. 10.

---

[15] Fusion flourished in the Gilded Age, when minority issue-oriented parties such as the Grangers, Greenbackers and others succeeded in gaining a foothold through fusion with the Democrats in a period when political parties, not governments, printed and distributed their own ballots. Timmons v. Twin Cities Area New Party, 520 U.S. 351, 356 (1997). After the 1888 presidential election, "widely regarded as having been plagued by fraud," states took over ballot printing and distribution, id.

But any such restriction must be reasonable and nondiscriminatory, as our Court of Appeals held in Reform Party of Allegheny County v. Allegheny County Dep't. of Elections, 174 F.3d 305 (3d Cir. 1999) (en banc).  Pennsylvania permits fusion.  Id. at 313.  In Reform Party, the Court considered a Pennsylvania prohibition on cross-nominating the same person for most state offices that made an exception for primary elections for five local offices in which major political parties were permitted to cross-nominate each other's candidates but minor parties were prohibited from doing so.  Id. at 308.  The Court concluded that Pennsylvania's ban, unlike the permissible across-the-board prohibition in Timmons, facially discriminated against minor political parties and violated their right to equal protection under the law.  Id. at 312.  The Court concluded that the burden was greater than what the Supreme Court considered in Timmons and adopted the "intermediate level of scrutiny" used in Timmons under which "the State's asserted regulatory interest need only be sufficiently weighty to justify the limitation imposed on the minor party's rights."  Id. at 314 (citing Timmons, 520 U.S. at 364) (internal quotation marks omitted).  Our Court of Appeals next weighed the election officials' four "plausible justifications."  Id. at 315; see also Anderson, 460 U.S. at 789 (The court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule").  Our Court of Appeals found each unpersuasive and held the ban violated the Patriot Party's right to equal protection.  It affirmed the District Court's injunction on equal protection grounds (but reversed the District Court's injunction on First Amendment free association grounds).  Id. at 318.

Section 2911(c)'s prohibition, too, constitutes a burden, albeit an incidental one that permits the Commonwealth to ascertain the degree of interest in minor political party candidates. It is undeniable that the Commonwealth may press its interest in "reasonable election regulations

that may, in practice, favor the traditional two-party system," <u>Timmons</u>, 520 U.S. at 367.  The defendants state their broad interest in "avoiding ballot clutter, ensuring viable candidates by limiting ballot access, and conducting an orderly election."  Def. MSJ at 18.  The defendants thus may permissibly burden the Green Party plaintiffs' First Amendment association and speech rights.

But under the <u>Reform Party</u> test, we are unpersuaded that defendants' expansively described interests justify their uneven application of an election regulation only as to the Green Party plaintiffs.  Defendants fail to explain how this regulation -- which leaves major political party members free to sign nomination papers for one candidate while voting for another in primaries but prevents minor party members from doing so -- ensures viable candidates by limiting ballot access or avoids ballot clutter.  Accordingly, we will grant in part the plaintiffs' motion as to Count X as applied to them.  We will enjoin Section 2911(c)'s prohibition on an elector signing more than one nomination paper for each political office in an election year as an unconstitutional burden on the rights of the Green Party plaintiffs to equal protection under the law.

But again we will not grant plaintiffs' motion as to their facial challenge because we decline to hold that there could be no conceivable set of circumstances under which such a requirement could be constitutional.  We will grant defendants' motion for summary judgment as to plaintiffs' facial challenge.

### E.    The Registration Requirement For Qualified Electors (Counts XIV and XV)

The Commonwealth interprets "qualified electors" under Section 2911(a) as having to be registered voters before signing nomination papers.

The Green Party plaintiffs contend this interpretation violates the Election Code, which

defines a "qualified elector" as

> [A]ny person who shall possess all of the qualifications for voting
> now or hereafter prescribed by the Constitution of this
> Commonwealth, or who, being otherwise qualified by continued
> residence in his election district, shall obtain such qualifications
> before the next ensuing election.

25 Pa. Stat. Ann. § 2602(t) (West 2014). Pl. Am. MSJ at 45-47. They also argue that the Code

distinguishes between a "qualified elector" and a "registered qualified elector," suggesting there

are qualified electors who are not registered to vote. Id. at 48. They urge us to adopt Judge Van

Antwerpen's determination in Morrill, where he held:[16]

> If the Commonwealth defines "qualified electors" who are
> permitted to verify election petition signatures such that the phrase
> includes only registered voters, then the statute is clearly
> unconstitutional under Buckley v. American Constitutional Law
> Foundation, Inc., 525 U.S. 182 (1999). Although lower state courts
> have construed the phrase "qualified electors" in other contexts, . .
> . the Pennsylvania Supreme Court has not specifically limited the
> phrase to apply to registered voters. We believe the Pennsylvania
> Supreme Court would attempt to give 25 [Pa. Stat. Ann.] § 2911(d)
> a constitutional construction, and hold that the term "qualified
> electors" applies to all residents of a particular electoral district.

Morrill, 224 F. Supp. 2d at 885. The Green Party plaintiffs contend that the Commonwealth's

interpretation of "qualified electors" impairs their First Amendment rights by prohibiting

otherwise qualified Pennsylvania citizens who are willing to sign their candidates' nomination

papers from doing so. Pl. Am. MSJ at 51. This prohibition constitutes a severe burden, they

argue, and does not advance a compelling governmental interest because defendants play no role

in verifying signatures (beyond their initial review). Id. at 52-54. They contest the

Commonwealth's reliance on the SURE system because private parties objecting to signatures

---

[16] In Morrill, 224 F.Supp.2d 905, Judge Van Antwerpen permanently enjoined the
Commonwealth from enforcing Section 2911(d)'s requirement that affiants for a particular
candidate be "qualified electors" of the district in which that candidate is running.

may use other means of verification.  Id. at 54.  They contend that the SURE system is not as

reliable as other signature verification means (such as handwriting analysis or affidavits from

signers).  Id. at 57.  They argue that the SURE system compresses signatures, rendering them

illegible or unrecognizable.  Id.  And they offer evidence from two signers whose signatures

were stricken who would have been available to attest to the validity of their signatures.  Id. at

Ex. E (Decl. of Lucia E. Veteran), ¶¶ 5-9, and Ex. F. (Decl. of Dawn Crean), ¶¶ 5-9.

The defendants counter that their interpretation -- that a "qualified elector" must also be a

"registered voter" -- has been upheld by our Court of Appeals in Rogers, 468 F.3d at 191 ("A

signatory must be a qualified elector of Pennsylvania who has registered to vote either on or

before the day he signs the nomination petition.").  The defendants contend that permitting

unregistered voters to sign nomination papers would place an "enormous burden" on the

objection process because unregistered voters do not appear in the SURE system.  Def. MSJ at

22.  The parties agree that the Secretary only checks the forms for completion and accepted

nomination papers are presumptively valid.  "The objection process therefore provides a critical

check on the nomination papers."  Id.  And the SURE system is the linchpin of that process

because it allows a "quick and easy way to detect a potential fraudulent signature."  Id.

> [I]n the typical challenge case the Commonwealth Court will order
> the parties to first jointly review the nomination paper entries using
> the SURE system and then present to the Court the entries that
> remain in dispute. . . .  [T]his initial review almost always greatly
> reduces the number of disputed signatures that the courts must then
> decide upon.

Id. at 23.  They dismiss the plaintiffs' arguments for reliance on handwriting experts as

impractical, expensive and not well-suited to the time constraints of signature challenges.  Id. at

24.  Without the SURE system, they argue, the "objection process would fall into disarray"

because the number of signature challenges would increase if circulators seek out unregistered

voters.  Id. at 25.  They propose that circulators carry voter registration applications alongside the nomination papers, so that the person could register and then sign.  Id.

Applying the now-familiar Burdick/Anderson test, we begin with the nature of the burden.  We conclude that the burden on the Green Party plaintiffs is severe, since it eliminates as potential signers all potential voters who register after the August 1 nomination paper deadline, but within the period specified by the Pennsylvania Constitution which is ninety days prior to an election.  See Pa. Const. Art VII, § 1.  And there is little doubt that the Commonwealth's definition of "qualified elector" is at odds with the registration provisions.

Nonetheless, we also conclude that the defendants have shown that they have a compelling interest in requiring registration to vote as the only means by which a nomination paper signature can be readily compared with the voter's registration in the event of an objection. As the parties agree, objectors challenge nomination paper signatures by petitioning the Commonwealth Court.  That Court holds a hearing to determine whether the signatures are valid, a process that often devolves into a signature-by-signature comparison battle waged, inter alia, by use of the SURE system.  See SF at ¶¶ 38, 39, 41.  There is no doubt that the SURE system, for all its flaws, is the easiest and most readily available tool for comparing voter registration records.  The SURE system is certainly narrowly tailored to achieve the Commonwealth's interest in preventing signature fraud.

Accordingly, the defendants have met their burden and we will deny the Green Party plaintiffs' motion as to the registration requirement for qualified electors.  We will grant summary judgment to the defendants as to Counts XIV and XV.


       **F.**       **The Challenges to SURE Signatures Because of**
                      **Missing Information, Third-Party Recordings, Different**

**Addresses, or Post-Signing Registration (Counts XVI-XXIII)**

A signature may be struck even if the nomination paper signature matches the SURE

system record when information required under Section 2911(c), such as an address, is missing.

AC at 142-43.  Signatures may also be struck, despite a SURE match, if a third party filled in

omitted necessary information.  Id. at 146-149.  Signatures may also be struck, despite a SURE

match, if the signer's current address differs from the address on record in the SURE system.  Id.

at 155.  Finally, a signature may be struck if the signer registered to vote after signing the

nomination papers, but within the allowable time period under Pennsylvania law.  Id. at 160.

The Green Party plaintiffs challenge these reasons as pretexts for striking signatures both

facially and as-applied.  They state that they lose "a significant percentage of nomination paper

signature[s] every election cycle" because the signer failed to print the required information in

the precise manner that Subsection (c) dictates, someone other than the signer filled in omitted

information, or the signer registered to vote after signing the nomination papers but within the

time Pennsylvania law permits.  Pl. Am. MSJ at 61-62.  They contend that defendant Marks

admitted the Commonwealth has no governmental interest in preventing third parties from

recording voter information (other than the signature).  Id. at 60.  Therefore, they argue, the

defendants cannot advance any compelling governmental interest in enforcing such a ban.  Id.

The defendants seek judgment in their favor on these counts.  They respond that requiring

the signer to provide a printed name, street address and town cannot be considered a burden,

particularly when that information is "essential to any method of verifying the legitimacy of an

entry, whether through SURE or another method."  Def. MSJ at 26.  They argue that the absence

of any of the required information would slow or fatally hamper a signature search on SURE.  Id.

at 27.  The minimal burden of including required information helps maintain "an orderly, fraud-

free election process."  Id.  They echo these arguments in opposition to plaintiffs' motion as to third-party recordings, which serves the significant governmental interest in providing additional handwritten information that may help detect fraud.  Id. at 28.

As to the claim of signatures struck when addresses differ, the defendants contend there is no allegation that the Secretary in fact rejects nomination papers on these grounds, id., and state that "This issue seems to be one between [the Green Party plaintiffs] and the Courts of Pennsylvania" because the defendants are not involved in signature challenges.  Id. at 28-29. Defendants state that plaintiffs' remedy for the Commonwealth Court's application of this standard is an appeal to the Pennsylvania Supreme Court, id. at 29, and because determinations of objections are the exclusive province of the state judiciary, judgment should be entered for the defendants.  Id. at 30.

Similarly, as to signatures struck for belated registration, the defendants contend that the Secretary does not check whether signers are in the SURE system (and they reiterate their suggestion that a circulator carry voter registration applications).  Id. at 30-31.

Once again, we apply the Burdick/Anderson test and consider the nature of the burden. We agree with defendants that the requirement that the signer complete all personal information and do so in his own hand constitutes a minimal burden.  The States may enact laws that incidentally burden candidates, Krislov, 226 F.3d at 859, particularly when the burden is a reasonable one, as it is here.  The defendants thus prevail on the Green Party plaintiffs' as-applied and facial challenges because the plaintiffs have not demonstrated that the burdens are severe and the defendants have shown the burdens imposed are reasonable ones.

As to signatures struck for different addresses or belated registration, we agree with the defendants that they play no primary role in striking challenged signatures.  Rather, as the parties

42

stipulated, the objectors who are private parties bear the burden of showing that a signature on a nomination paper is not genuine.  SF at ¶ 40.  As defendants observe, the weight the Commonwealth Court gives to evidence in objection proceedings is not a matter over which they have any control.  Def. MSJ at 33.  To the extent that they are ordered to strike a signature, they do so pursuant to a Commonwealth Court order.  Id. at 34

Accordingly, we will grant defendants' motion for summary judgment as to Counts XVI, XVII, XVIII and XIX.

As the parties agree that the defendants play no role in striking signatures, we will deny the Green Party plaintiffs' amended motion for partial summary judgment as to these counts and grant summary judgment for the defendants on the facial and as-applied challenged in Counts XX through XXIII.

      G.      **The NVRA Prohibition on Striking**
                      **Signatures for Differing Addresses (Count XXIV)**

The Green Party plaintiffs contend that the NVRA prohibits defendants from striking signature solely because the signer has moved to another address within the county or district.  Pl. Am. MSJ at 62.  Because the NVRA prohibits striking from federal voter registration a voter who moves within the same county, they argue a move should not disqualify a nomination paper signer.  Id. at 63-65.

The defendants reply that plaintiffs have failed to show that they are non-compliant with the NVRA.  Def. MSJ at 31.   Their reliance on the SURE system to evaluate nomination papers, they contend, does not come under the NVRA and therefore claims based on violations of this statute are without merit.

We agree.  The NVRA "requires States to provide simplified systems for registering to

vote in federal elections." <u>Arizona v. Inter Tribal Council of Arizona, Inc.</u>, 133 S. Ct. 2247, 2251 (2013) (emphasis omitted) (quoting <u>Young v. Fordice</u>, 520 U.S. 273, 275 (1997)).  It governs, <u>inter alia</u>, States' requirements to permit prospective voters to register to vote in elections for federal office.  The plaintiffs fail to show how the defendants' rules governing nomination papers runs afoul of the NVRA.  We may exercise our jurisdiction only when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment."  <u>1st Westco Corp. v. School Dist. of Philadelphia</u>, 6 F.3d 108, 113 (3d Cir. 1993) (quoting <u>Maryland Cas. Co. v. Pacific Coal & Oil Co.</u>, 312 U.S. 270, 273 (1941)).

Because there is no case or controversy to be decided as to Count XXIV, we dismiss plaintiffs' motion for relief and grant the defendants' summary judgment as to this Count.

### H.    State Law Claims (Counts XXV -XXIX)

The Green Party plaintiffs argue that the defendants act in excess of their authority under the Election Code and seek relief on three of their five state law claims under our supplemental jurisdiction.  First, they contend that the defendants act in excess of their authority when they strike signatures where the recorded address does not match the voter's current address, in what they contend is a violation of the NVRA.  AC at 166-167.[17]  Second, they seek a similar determination as to the defendants' interpretation of the term "qualified elector".  <u>Id.</u> at 171-74.  And, finally, they contest the defendants' statutory authority to strike pre-registration signatures.  <u>Id.</u> at 174-175.

The defendants seek dismissal of all these state claims contending that we lack

---

[17] The plaintiffs do not seek relief on two state claims that the defendants acted in excess of their statutory authority by striking signatures where the address of record does not match the current address and requiring notarization on nominating petitions.  <u>See</u> Pl. Am. MSJ at 1.

jurisdiction to hear them under Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984).

Separately, they argue that the plaintiffs' claims are meritless.  Def. MSJ at 33.  As to plaintiffs'

contentions about the notarization and registration requirements, the defendants point us to the

arguments we considered above.  Id. at 34.

We will grant defendants' motion for summary judgment as to all state law claims.

In Pennhurst, 465 U.S. at 117, the Supreme Court held that "a federal suit against state

officials on the basis of state law contravenes the Eleventh Amendment when. . . the relief

sought . . . has an impact directly on the State itself."  The Eleventh Amendment bars us from

adjudicating a suit against the Commonwealth of Pennsylvania.  Id. at 123.   When, as here, a

plaintiff sues a state official for exceeding his or her authority, the criterion for determining

whether that suit is in fact against the sovereign state is the effect of the relief sought.  Id. at 107.

Although a district court may hold state officials accountable to "the supreme authority of the

United States" in order to vindicate federal rights, id. at 105 (quoting Ex Parte Young, 209 U.S.

123, 160 (1908)), a "grant of relief against state officials on the basis of state law. . . does not

vindicate the supreme  authority of federal law."  Id. at 106.

> [I]t is difficult to think of a greater intrusion on state sovereignty
> than when a federal court instructs state officials on how to
> conform their conduct to state law.  Such a result conflicts directly
> with the principles of federalism that underlie the Eleventh
> Amendment.

Id.  To be sure, Pennhurst does not preclude us from granting injunctive relief against the

defendants based on violations of federal law.  See Barnes v. Cohen, 749 F.2d 1009, 1019 (3d

Cir. 1984).

In Counts XXV through XXIX, the Green Party plaintiffs seek a determination that the

defendants exceeded their authority under the Pennsylvania Election Code.  But the remedy they

seek would invalidate those statutes under state law by enjoining their enforcement.  We must therefore dismiss plaintiffs' claims for such relief on Eleventh Amendment grounds and grant defendants' motion for summary judgment as to those Counts.

An Order follows.