IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREEN PARTY OF PENNSYLVANIA, et al. | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| CAROL AICHELE, Secretary of the Commonwealth of Pennsylvania, et al. | : | NO. 14-3299 |
| | : | |

MEMORANDUM

Dalzell, J.                                                                 May 11, 2015

The question before us is whether the Commonwealth's requirement that circulators of nomination papers for a candidate who seeks to appear on the general election ballot in Pennsylvania use different nomination papers for each county unconstitutionally burdens plaintiffs' First Amendment speech rights.  For the reasons detailed below, we conclude this challenged statutory provision -- the sole issue remaining among plaintiffs' twenty-nine constitutional and statutory challenges to the Pennsylvania Election Code -- is a reasonable, nondiscriminatory election-related regulation that permissibly burdens plaintiffs' speech and does not, therefore, unduly infringe upon their constitutional rights.  Accordingly, we will deny plaintiffs' motion for summary judgment as to the requirement of using separate nomination papers per county and enter judgment in favor the defendants as to this final count.

Also, we had ordered the parties to address whether the five claims for relief we denied as moot on March 2, 2015 continue to present a case or controversy in light of the Commonwealth's representations that its revised nomination forms addressed plaintiffs' expressed concerns.  Because the Commonwealth has altered the nomination paper format and the plaintiffs have failed to articulate any reasons those revised nomination forms continue to

impinge on their constitutional rights, we will affirm our March 2, 2015 decision as to its mootness holding.

## I.      **Factual and Procedural Background**

On June 9, 2014 the Green Party of Pennsylvania, the Libertarian Party of Pennsylvania, and six individuals affiliated with those political entities (collectively, the "Green Party plaintiffs") filed suit to challenge the Commonwealth's enforcement of three provisions of the Pennsylvania Election Code.  On June 24, 2014 the case was reassigned to us from the docket of Judge Thomas N. O'Neill, Jr.[1]  On July 14, 2014, the Green Party plaintiffs filed a 182-page amended complaint listing twenty-nine counts for relief alleging that the statutory provisions of the Election Code at issue was facially unconstitutional, unconstitutional as-applied, and violated the National Voter Registration Act, the Elections and Supremacy Clauses of the U.S. Constitution, and certain Pennsylvania election laws.

The plaintiffs, aspiring[2] political parties and their supporters, sought declaratory, injunctive and mandamus relief from the Commonwealth's requirements governing nomination papers that must be submitted under its rules for members of minor parties (such as the Libertarian Party of Pennsylvania) and political bodies (including the Green Party of Pennsylvania) who seek to appear on the general election ballot.  Amended Complaint ("AC") at 2.  Under the Election Code, major party candidates file "nomination petitions" to appear on the primary election ballot, in contrast with the two major political parties whose candidates' names are published on general election ballots.  But minor parties and political bodies use "circulators"

---

[1] On the same day the Pennsylvania Attorney General's Office entered its appearance on behalf of the Commonwealth of Pennsylvania, thereby satisfying Fed. R. Civ. P. 5.1.
[2] We take this word from our Court of Appeals's decision last year in The Constitution Party of Pennsylvania, et al. v. Aichele, et al., 757 F.3d 347, 350 (3d Cir. 2014).

to gather signatures on "nomination papers," to be filed with the Pennsylvania Department of State, so that their candidates may appear on the general election ballot.  See Constitution Party of Pennsylvania, et al. v. Carol Aichele, et al., 757 F.3d 347, 351 (3d Cir. 2014).

The Commonwealth's requirements regarding nomination papers are set forth in 25 Pa. Stat. Ann. § 2911 (West 2014).  On July 29, 2014, three days before the August 1, 2014 nomination paper filing deadline, the Green Party plaintiffs filed an emergency motion for a temporary restraining order and preliminary injunction that sought to enjoin the defendants from enforcing their interpretation of 25 Pa. Stat. Ann. §§ 2911 (a), (c) and (d) (West 2014).

The contested portions of Section 2911 provide that:

> (a). . .[N]omination of candidates for any public office may also be made by nomination papers signed by qualified electors[3] of the State, or of the electoral district for which the nomination is made, and filed in the manner herein provided. . . .
>
> (c) Each person signing a nomination paper shall declare therein that he is a qualified elector of the State or district, as the case may be, and shall add to his signature his legibly printed name and residence, giving city, borough or township, with street and number, if any, and shall also add the date of signing, expressed in words or numbers: Provided, however, That if said political district named in the papers lies wholly within any city, borough or township, or is coextensive with same, it shall not be necessary for any signer of a paper to state therein the city, borough or township of his residence. No elector shall sign more than one nomination paper for each office to be filled, unless there are two or more persons to be elected to the same office, in which case he may sign nomination papers for as many candidates for such office as, and no more than, he could vote for at the succeeding election. More than one candidate may be nominated by one nomination paper and candidates for more than one office may be nominated by one

---

[3] The Election Code does not define "elector." But, a "qualified elector" is defined as "any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election." 25 Pa. Stat. Ann. § 2602(t) (West 2014).

nomination paper: Provided, That each political body nominating does not nominate more candidates than there are offices to be voted for at the ensuing election: And provided, That all the signers on each nomination paper are qualified to vote for all the candidates nominated therein.

(d) Nomination papers may be on one or more sheets and different sheets must be used for signers resident in different counties. If more than one sheet is used, they shall be bound together when offered for filing if they are intended to constitute one nomination paper, and each sheet shall be numbered consecutively, beginning with number one (1) at the foot of each page. Each sheet shall have appended thereto the affidavit of some person, not necessarily a signer, and not necessarily the same person on each sheet, setting forth--(1) that the affiant is a qualified elector of the State, or of the electoral district, as the case may be, referred to in the nomination paper; (2) his residence, giving city, borough or township with street and number, if any; (3) that the signers signed with full knowledge of the contents of the nomination paper; (4) that their respective residences are correctly stated therein; (5) that they all reside in the county named in the affidavit; (6) that each signed on the date set opposite his name; and (7) that, to the best of affiant's knowledge and belief, the signers are qualified electors of the State, or of the electoral district, as the case may be.

25 Pa. Stat. Ann. §§ 2911 (a), (c) and (d) (West 2014) (contested provisions underlined).

Specifically, the plaintiffs sought to enjoin the defendants from enforcing (1) their interpretation that Subsection (a) requires that a "qualified elector" be a registered voter before they could sign nomination papers; (2) Subsection (c)'s requirement that signers of nomination papers record the year of signing; (3) Subsection (d)'s in-state residency requirement for witnesses executing an "Affidavit of Qualified Elector" -- that plaintiffs refer to as the "In-State Witness Requirement" -- (4) the requirement on the nomination paper form that it be executed "in the presence of a person empowered to take acknowledgments (such as a notary public)"; and (5) Subsection (d)'s requirement that different sheets be used by signers resident in different counties.  Emer. Mot. at 1, 2.

On July 31, 2014, we held a hearing on the emergency motion.  Based on the parties'

stipulations and the testimony in court that day, we from the bench granted in part and denied in part the plaintiffs' motion for an emergency temporary restraining order or preliminary injunction. We enjoined the defendants from enforcing the In-State Witness requirement of 25 Pa. Stat. Ann. §2911(d). But we denied the Green Party plaintiffs' motion as to Subsection (d)'s nomination requirement that the circulator's Affidavit should be executed in the presence of a person empowered to take acknowledgments, such as a notary, and that different sheets be used for signers who reside in different counties. We also denied plaintiffs' motion as to defendants' interpretation of Subsection (a)'s requirement that qualified electors signing nomination papers be registered to vote on or before the day they sign the nomination papers. Finally, as the Commonwealth's Commissioner of Elections represented to us that the Commonwealth no longer enforces Subsection (c)'s requirement that each person signing a nomination paper record the year of signature, we denied that aspect of the emergency motion as moot and memorialized our decisions in our July 31, 2014 Order.

On August 4, 2014 we convened a Rule 16 conference in Chambers and set a schedule for dispositive motions. On October 31, 2014, the defendants filed a motion for summary judgment and the same day the Green Party plaintiffs filed a motion for partial summary judgment, which they sought to amend on November 19, 2014.

On March 2, 2015, we granted plaintiffs' motion in part. We granted them leave to amend their motion for summary judgment and add an equal-protection claim. We also granted their motion for relief from defendants' enforcement of the in-state residency requirement for affiants executing an "Affidavit of Qualified Elector" under 25 Pa. Stat. Ann. § 2911(d), declaring that requirement to be an unconstitutional burden under the First and Fourteenth Amendments of the United States Constitution -- as applied to plaintiffs only -- and we enjoined

5

the defendants from enforcing it.  We also granted the plaintiffs' motion for relief from

defendants' requirement that the "Affidavit of Qualified Elector," required pursuant to 25 Pa.

Stat. Ann. §2911(d), be executed in the presence of a person empowered to take

acknowledgments, such as a notary, and declared that requirement to be an unconstitutional

burden -- as applied to the plaintiffs only -- under the First and Fourteenth Amendments of the

United States Constitution.  We enjoined defendants' enforcement of that requirement as well.

And we declared 25 U.S.C. § 2911(c)'s prohibition on a qualified elector signing more than one

nomination paper for each office to be filled to be an unconstitutional burden on the rights of

plaintiffs to the equal protection of the law under the Fourteenth Amendment and enjoined

defendants from enforcing it against the plaintiffs.

Based on the Commonwealth's representation that it has altered the nomination paper

forms, we denied as moot plaintiffs' motion for relief as to five counts -- facial and as-applied

challenges to the Commonwealth's requirement that signers record the year of their signatures;

facial and as-applied challenges to the Secretary of the Commonwealth's warning printed on

nomination paper forms stating they are open to challenge if the circulator does not reside in the

district specified on the paper; and an as-applied challenge to the space allocated on the forms for

"presidential electors" in nonpresidential election years.

We granted defendants' motion as to all other counts save the one remaining before us

now -- the requirement under 25 Pa. Stat. Ann. § 2911(d) that circulators use different

nomination sheets for signers resident in different counties thereby obliging them to carry

nomination papers for the sixty-seven counties in Pennsylvania when collecting signatures.

## II.    __The Requirement For Different Sheets For Each County__

In their motion for summary judgment, the Green Party plaintiffs contended that Section

2911(d)'s requirement that different nominating sheets be used for signers from different counties is a "relic from the time when nomination paper signatures were sent to each individual county by Commonwealth Court" so each county could check challenged signatures against their paper records. Pl. Am. MSJ at 36-37. As the parties agreed in their stipulated facts, private parties (not the Commonwealth) challenge nomination petitions and papers, which are presumed by statute to be valid if timely filed with and accepted by the Secretary. See Green Party of Pennsylvania v. Aichele, -- F. Supp. 3d --, 2015 WL 871150 at *6 (E.D.Pa. Mar. 2, 2015). Such objectors bear the burden of showing that a signature on a nomination paper is not genuine. Id. The Commonwealth Court hearing such an objection requires objectors to compare the information on the nomination paper with the information recorded in the Statewide Uniform Registry of Electors ("SURE") system. Id.

Enforcement of the county-by-county nomination paper requirement severely impairs plaintiffs' speech, they claimed, because circulators must either juggle nomination papers for sixty-seven separate counties or forego signatures. Pl. Am. MSJ at 39; see also Ex. B (Decl. of Green Party member Carl Romanelli) (attesting to the impossibility of carrying or efficiently managing nomination papers for more than a few counties). See also Ex. A (Decl. of John J. Sweeney) at ¶¶ 27-29. The plaintiffs maintained that this regulation fails to advance any governmental interest because county election officials now upload and maintain voter registration information on the SURE system. Id. at 37, 40.

In their motion for summary judgment, the defendants questioned whether this regulation poses any burden because "the reality is that a circulator gathering signatures . . . is most likely to encounter residents of that county or the surrounding counties." Def. MSJ at 15. Lifting this requirement, they contended, would create confusion for the Secretary who is tasked with

processing the nomination papers by the August 1 deadline.  Under the present system, they

contended, the Secretary can determine by looking at a nomination paper submitted for either a

statewide or local candidate whether the local candidate has enough signatures from residents in

his or her district because they would be separated by county.  Id. at 16.  Otherwise, she would

have to review all of the nomination papers submitted to search for each endorsement of a local

candidate.  They argued the submission of county-by-county nomination papers constitutes a

minimal burden.

In our March 2, 2015 Memorandum, we considered plaintiffs' motion viewing the facts

in the light most favorable to the defendants.  We found genuine issues of material fact as to the

degree of burdensomeness and the extent of the governmental interest involved.  We held that

the defendants, who are the party without the burden of proof, failed to point to the lack of

evidence supporting the plaintiffs' claim and provided no affidavits or other admissible evidence

in support of their contention that confusion would ensue were we to enjoin enforcement of this

regulation.

We ordered the parties to submit affidavits detailing the impact of the requirement that

"different sheets must be used for signers resident in different counties."  Mar. 2 Order.  And we

also ordered the parties to address whether plaintiffs' claims for relief under the counts we

deemed moot continue to present a case or controversy in light of defendants' representation that

the new forms address these concerns.

We turn to those issues now.

III.   **Legal Standard**

A.   **Summary Judgment**

Summary judgment is warranted if there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party moving

for summary judgment bears the burden of proving no genuine issue of material fact exists.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).   To that end,

the movant must inform the district court of the basis for its argument by "identifying those

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

of material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   A factual dispute is

"genuine" if it turns on "evidence on which the jury could reasonably find for the plaintiff."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  A fact is "material" if it "might

affect the outcome of the suit under the governing law."  Id. at 248.  That is, "only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude"

summary judgment.  Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir.

1998) (quoting Anderson, 477 U.S. at 248).

 When both parties move for summary judgment, our task is no different.  As our Court of

Appeals has cautioned,

> Cross-motions are no more than a claim by each side that it alone
> is entitled to summary judgment, and the making of such
> inherently contradictory claims does not constitute an agreement
> that if one is rejected the other is necessarily justified or that the
> losing party waives judicial consideration and determination
> whether genuine issues of material fact exist. If any such issue
> exists it must be disposed of by a plenary trial and not on summary
> judgment.

Rains v. Cascade Industries, Inc., 402 F.2d 241, 245 (3d Cir. 1968).  Each party, as a movant for

summary judgment, bears the burden of establishing that no genuine issue of material fact exists

and that it is entitled to a judgment as a matter of law.  10A Charles Alan Wright and Arthur R.

Miller, Federal Practice & Procedure, § 2720 (3d ed. 2014).  As in any summary judgment

motion, the determination whether a genuine issue concerning a material fact exists is itself a question of law that the Court must decide.  Where the movant is the defendant or the party that does not have the burden of proof on the underlying claim, it "has no obligation to produce evidence negating its opponent's case," National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992).  The movant need only point to the lack of evidence supporting the non-movant's claim.  Id.

If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  See Celotex, 477 U.S. at 322.  Specifically, Fed. R. Civ. P. 56(e) provides in relevant part that "[i]f a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."

Because we consider cross-motions before us, "[t]he fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied his burden and should be granted summary judgment on the other motion."  10A Wright & Miller at §2720.

### B.    Facial and As-Applied Challenges

Plaintiffs challenge the Commonwealth's requirement of using separate nomination papers for each county as applied to them.  The distinction between facial and as-applied challenges goes to the scope of the statute's claimed constitutional infirmity and the breadth of the remedy sought.  See Citizens United v. Federal Election Commission, 558 U.S. 310, 331 (2010). "An as-applied attack ... does not contend that a law is unconstitutional as written but

that its application to a particular person under particular circumstances deprived that person of a constitutional right." United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010). By contrast, a plaintiff asserting a facial challenge "seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question." City of Chicago v. Morales, 527 U.S. 41, 55 n. 22 (1999). A facial challenge succeeds only when there is "no set of circumstances" under which the statute at issue would be valid, Heffner v. Murphy, 745 F.3d 56, 65 (3d Cir. 2014) -- a "particularly demanding" standard. Id.[4]

Thus, the remedy for an as-applied challenge would be to bar its enforcement against a particular plaintiff alone under narrow circumstances. See CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 624 (3d Cir. 2013); accord Voting for America, Inc. v. Andrade, 488 F. App'x 890, 916-17 (5th Cir. 2012). Our Court of Appeals has also cautioned that district courts granting injunctions in such cases "should craft remedies 'no broader than necessary to provide full relief to the aggrieved plaintiff.'" Belitskus v. Pizzingrilli, 343 F.3d 632, 649-50 (3d Cir. 2003) (quoting McLendon v. Continental Can Co., 908 F.2d 1171, 1182 (3d Cir. 1990)).

## C.   The Level Of Scrutiny

As we explained in our March 2, 2015 Memorandum, ballot-access cases oblige us to balance citizens' fundamental rights of association and speech protected by the First and Fourteenth Amendments against the Commonwealth's countervailing rights, rooted in Article I

---

[4] The Supreme Court disfavors facial challenges because they tend to arise before the State has had an opportunity to implement the statute in question or its courts have yet to construe that law in actual disputes. As the Court explained in Washington State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008), "Claims of facial invalidity often rest on speculation" about the reach of a statute and "run contrary to the fundamental principle of judicial restraint" by anticipating the meaning of a constitutional rule before it has been decided. As the remedy for a successful facial challenge is the complete invalidation of a law, "we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."

of the United States Constitution, to regulate the time, place and manner of elections. States' interests lie in limiting the number of candidates in an election to avoid ballot overcrowding, preserving the fairness and integrity of the electoral process, and avoiding confusion, deceptions, or frustration of the democratic process. See Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986).

We need not apply a specific level of scrutiny. Rogers v. Corbett, 468 F.3d 188 (3d Cir. 2006). Rather, we weigh "'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" Burdick v. Takushi, 504 U.S. 428, 434 (1992) (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)). Under this flexible standard, the rigorousness of our inquiry would depend upon the extent to which a challenged provision burdens First and Fourteenth Amendment rights.

The Supreme Court summarized in Burdick the balance required to determine the level of scrutiny:

> [W]hen those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

Id. (internal citations omitted).

In short, we look at the nature of the rights involved and the burdens imposed on those rights to determine whether the complained-of burden is justified. Rogers, 468 F.3d at 194.

Under the <u>Burdick/Anderson</u> test, we begin with the nature of the burden. "[N]ot every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." <u>Id.</u> (internal citation omitted). Lesser burdens receive less exacting scrutiny and the State need not establish a compelling interest in order to prevail. "No bright line separates permissible election-related regulation from unconstitutional infringements." <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 359 (1997). As the Seventh Circuit cautioned, "The Constitution does not prohibit the States from enacting laws which incidentally burden candidates, for such a proscription would similarly preclude the regulation of elections and efforts to ensure their integrity." <u>Krislov v. Rednour</u>, 226 F.3d 851, 859 (7th Cir. 2000) (internal citations omitted). "Because elections must be regulated to remain free from fraud and coercion, some latitude is given to regulations designed to serve these purposes," <u>id.</u>

Ballot access "may be limited in accord with appropriate state interests, and . . . limitations imposed in furtherance of such interests need not be the most narrowly drawn as long as they are nondiscriminatory and reasonable in light of the relevant burdens." <u>Rogers</u>, 468 F.3d at 194. If we deem the burden reasonable and the Commonwealth's interest valid, we will not oblige the Commonwealth to impose its burden by the least restrictive means. <u>Id.</u> at 195.

## III.   <u>Factual Basis</u>

### A.   <u>Affidavit Of Jonathan Marks For Defendants</u>

Jonathan Marks oversees the Division of Elections and Voter Registration as Commissioner of the Pennsylvania Department of State's ("DOS") Bureau of Commissions, Elections, and Legislation. Marks Aff. at ¶¶ 1, 2. The DOS cannot list a minor political party or political body candidate on the general election ballot until it has ascertained whether the candidate has submitted the legally required number of signatures. <u>Id.</u> at ¶ 3. The DOS limits its

review to the elements that are apparent on the face of the nomination papers (leaving to objectors the task of challenging signer eligibility).  Id.

Marks contends that "[i]f nomination papers are not separated by county, there will be an impact  to the objection process" because objectors will have to search statewide rather than county-by-county in the SURE system.  Id. at ¶ 5.

> These statewide searches will take more time because it will be necessary to enter more information for each query, assuming the information on the form is legible.  And. . . without being able to narrow the results by county, statewide searches in SURE will produce less precise results. . . .  Less precise results require the user in some circumstances to sift through multiple voter[] records returned as a result of a single query.  This is particularly true when dealing with common names or identical addresses in different counties.  This additional work means objectors would experience an increased burden in reviewing, over the course of one week, nomination papers that contain tens of thousands of signatures if the signers' counties of residence are commingled on a single sheet.

Id.  As a result, election litigation would take longer to resolve.  Id. at ¶ 6.

"The court's standard case management and scheduling order requires the parties to meet before the hearing on the objection and, with the assistance of a SURE operator, if appropriate, review each and every challenged signature line."  Id. (emphasis in original).  Marks contends that litigation delays would create the possibility of conflict with other statutory deadlines.  Id. For example, county Boards of Elections must transmit absentee ballots no later than fifty days before a primary election and seventy days before a general or municipal election to overseas voters and uniformed service personnel who submit an application.  Id.; see also 25 Pa. Stat. Ann. § 3508(b)(1).  They must also transmit absentee ballots no later than forty-five days before a primary or November election to all uniformed service personnel and overseas voters who submit an application.  Id.  "DOS and the county boards of elections have a compelling interest

in finalizing the ballot in order to ensure that all electors are able to participate equally in the election process." Id.

Marks also maintains that eliminating the separation by county requirement will slow the process and increase plaintiffs' costs. Id. at ¶ 7.

Marks also offers samples of the nomination paper forms for political bodies and minor political parties for the 2015 election year which demonstrate that the Commonwealth no longer includes the printed warning or the "Presidential Electors" section.  Id. at ¶¶ 8, 9.  The forms are printed with the year "2015" on the header, id., thereby obviating the need for signers to write the year of signing.

### B.     Affidavits Of Carl J. Romanelli And Paul A. Rossi, Esq. For Plaintiffs

Carl J. Romanelli states he has been a Green Party candidate for the United States Senate and circulated nomination papers for himself and Green Party candidates for state office. Romanelli Aff. at ¶¶ 3-5.  The requirement that different sheets be used for signers in different counties makes signature gathering slower, costs candidates the signatures of those who cannot wait until the circulator finds the right paper, increases the party's printing and mailing costs by requiring sheets for every county when circulators canvas transportation hubs, and has resulted in Green Party candidates being stricken from the general election ballot.  Id. at ¶ 7.

Romanelli states the requirement obliges him to ask willing signers their county of residence and then he must find the right sheet, which "significantly slows down [the] already tedious and slow process" necessary to secure sufficient valid signatures.  Id. at ¶¶ 8, 9.  Some willing signers do not know their county of residence, in which case he has guessed (not always correctly).  Id. at ¶ 10.  When a signature is on the wrong county's sheet, that signature may be struck.  Id. at ¶ 14.  The extra time it takes to query signers and find the right sheet reduces the

time volunteers have to spread the Green Party message.  Id. at ¶ 12.  And sometimes registered electors are unwilling to wait while a circulator is "forced to fumble around searching for the specific nomination paper" for that signer's county.  Id. at ¶ 15.  Sometimes, Romanelli lacked a "blank nomination paper" to accommodate that signer's county because "[t]here is a limit on the number of nomination papers that can be carried around," and he has consequently lost a signature.  Id. at ¶ 16.

The Green Party must print its own sheets, so the requirement is costly as every circulator must in theory carry papers for every county.  Id. at ¶¶ 17-19.  Romanelli attests that

> some circulators fail to turn in nomination papers where only a few lines have been executed for less populated counties, because they do not believe that mostly blank nomination papers are worth the effort (and sometime[s] the cost of postage) to return to the candidate. . . .  [S]ome circulators are a bit embarrassed to turn in mostly blank nomination papers for counties in which they could not or did not secure more signatures. . . .  [I]t is easier[] and more rewarding[] for circulators to return full nomination papers than mostly blank nomination papers.

Id. at ¶ 20.  Romanelli also contends that a trained operator of the SURE system can locate a voter record in any county through a single statewide search from anywhere in the Commonwealth.  Id. at ¶ 22.

Romanelli also states that in a challenge to plaintiff John J. Sweeney's signatures on his nomination papers for state Senate in 2014, Sweeney lost fifteen signatures because the signer recorded his or her signature on a nomination paper for the wrong county (as a result of which Sweeney was two signatures shy of the 500 he needed to secure access to the Commonwealth's general election ballot.  Id. at ¶ 23.  Romanelli states that in every signature challenge otherwise valid signatures are struck because the wrong county of residence is recorded.  Id. at ¶ 24.

Paul A. Rossi, Esq., who represents the plaintiffs (and represented Sweeney in his failed

2014 election bid), also attests to the ability of the SURE system to locate a voter record through a single statewide search without specific county information.  Rossi Aff. at ¶¶ 5, 6, 11, 12.  He contends the Libertarian candidates for federal and statewide office in 2012 (whom he also represented) lost 183 otherwise valid signatures because they were entered on nomination papers for the wrong county, a number which was larger than the margin of victory required to secure a spot on the general election ballot.  Id. at ¶ 15.

Rossi also contends that, as a result of this requirement, plaintiffs' claims for relief as to the five counts we deemed moot[5] "continue to present a claim or controversy even with defendants' representation concerning the new format of the nomination papers they intend to publish in future elections."  Id. at ¶ 9.

## IV.   Discussion

### A.   The County-by-County Nomination Paper Requirement

Under the Burdick/Anderson balancing test, we begin by considering the burden's contours.  We weigh the "character and magnitude" of the burden the State's rule imposes against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.  See Burdick, 504 U.S. at 434 (quoting Anderson, 460 U.S. at 788).  As we stated above, "[n]o bright line separates permissible election-related regulation from unconstitutional infringements," Timmons, 520 U.S. at 359.

Our first step is to consider the burden.  The rights at issue are the right to vote and to

_____

[5] As rehearsed above, plaintiffs challenged facially and as-applied the Commonwealth's requirement that signers record the year of their signatures and its warning printed on nomination paper forms from the Secretary of the Commonwealth stating nomination papers are open to challenge if the circulator does not reside in the district specified on the paper.  They also brought an as-applied challenge to the space allocation for "presidential electors" in nonpresidential election years.  We held these challenges were moot because the Commonwealth agreed to amend its forms.

associate for political purposes. See, e.g.. The Council for Alternative Political Parties v. Hooks, 179 F.3d 64, 74 (3d Cir. 1999). The plaintiffs claim the extra cost of printing separate nomination papers sheets and the loss of signatures when would-be signers prove too impatient to wait for a circulator fumbling for the right county sheet so they can sign. Romanelli Aff. at ¶¶ 17-19, 23, 24. They also point to several recent occasions when their candidates have lost otherwise valid signatures because they were registered in the wrong county of residency. Id. at ¶ 15. They also assert their own circulators fail to turn in partially filled sheets both from embarrassment and cheapness, id. at ¶ 20, a failure perhaps not to be laid at the Commonwealth's feet.

The requirement for using separate sheets per county burdens the plaintiffs to an extent. But not every burden crosses an impermissibly unconstitutional threshold: Every state election law governing registration or voter qualification, candidate eligibility, or the process of securing a spot on a ballot "inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends." Anderson, 460 U.S. at 788.

In upholding a state antifusion law prohibiting candidates from appearing on the ballot as the candidate for more than one political party, the Supreme Court in Timmons explained, "[T]he States' interest permits them to enact reasonable election regulations that may, in practice, favor the traditional two-party system. . . . States need not remove all of the many hurdles third parties face in the American political arena today." Timmons, 520 U.S. at 367. Along those lines, our Court of Appeals upheld as reasonable Pennsylvania's requirement that political body candidates for a general election gather signatures equal to two percent of the vote total of the candidate with the highest number of votes for state-wide office in the previous election. Rogers, 468 F.3d at 190-91. Certainly, achieving that signature threshold constitutes a more onerous burden than

shuffling different nomination papers per county.

We consider also the interests the Commonwealth contends justify this burden.  The "increased burden" on objectors challenging signatures, Marks Aff. at ¶ 5, is not the Commonwealth's interest to assert, as the Commonwealth plays no role in signature challenges. Nonetheless, the Commonwealth details consequences from delays arising from a more cumbersome signature search process.  Commissioner Marks notes that the Election Code requires county Boards of Elections to transmit absentee ballot to overseas voters and uniformed service personnel no later than seventy days before a general or municipal election.  Id. at ¶ 6. That statutory requirement means that this year signature challenges to nomination papers must be completed by August 25, 2015 so that absentee ballots for municipal elections can be sent overseas in time for Election Day on November 3, 2015.  The time period for a general election is more generous.  Id.  But as a practical matter all challenges must be resolved by mid-September.

 "Lesser burdens trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.' "  Timmons, 520 U.S. at 358 (quoting Burdick, 504 U.S. at 434).  Because the Commonwealth's burden is a permissible one, it does not trigger exacting review.  The Commonwealth's stated interest in readying the general election ballot in conformity with other election laws in order to allow distribution of absentee ballots to its far-flung electorate is an important regulatory interest.  It suffices to justify the reasonable, nondiscriminatory requirement that the aspiring political parties collect supporters' signatures timely enough to permit efficient challenges before sending out absentee general election ballots.  That is particularly the case where, as here, the impediment seems as much one of physical coordination and political energy as state regulation.

The Commonwealth's interest in orderly elections that do not accidentally disenfranchise some portion of the electorate trumps the inconvenience this regulation imposes on plaintiffs.

      B.     The Commonwealth's Former Requirement That Signatories Record
               The Year When They Sign The Nomination Forms And Its Bygone
               Format With Space For Presidential Electors In Nonpresidential Election
               Years And With A Printed Warning That Nomination Papers Might Be
               <u>Challenged If The Circulator Was Not Resident In The Electoral District</u>

In our March 2, 2015 Memorandum, we concluded that the Commonwealth's decision to alter its nomination paper forms for political bodies and minor parties rendered moot five claims for relief.  Mootness has two aspects: (1) the issues presented are no longer "live", or (2) the parties lack a cognizable interest in the outcome.  <u>New Jersey Turnpike Auth. v. Jersey Cent. Power & Light</u>, 772 F.2d 25, 31 (3d Cir. 1985).  As our Court of Appeals therein explained, "[A] matter is not necessarily moot simply because the order attacked has expired[. If] the underlying dispute between the parties is one capable [of] repetition, yet evading review, it remains a justiciable controversy within the meaning of Article III."  <u>Id.</u> (internal citation and quotation marks omitted).

To show their claim is excepted from mootness, the plaintiffs must establish that (1) the challenged action was too short in duration to be fully litigated to its expiration, and (2) there is a reasonable likelihood they will be subjected to the same action again.  <u>See Doe v. Delie</u>, 257 F.3d 309, 313 (3d Cir. 2001).

The plaintiffs make no such showing.  Indeed, they fail to advance any reason why the requirements since abandoned by the Commonwealth would continue to burden their candidates. We may exercise our jurisdiction only when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment."  <u>1st Westco</u>

Corp. v. School Dist. of Philadelphia, 6 F.3d 108, 113 (3d Cir. 1993) (quoting Maryland Cas. Co.

v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941)).  Because there is no case or controversy to

be decided as to these claims, which we dismissed as moot in our March 2, 2015 Order, we will

thus affirm that Order.


BY THE COURT:


  /s/ Stewart Dalzell, J.
Stewart Dalzell, J.